**UNITED STATES of America**

v.

**ONE 1973 ROLLS ROYCE V.I.N. SRH–16266.**

**Civ. A. No. 90–1487.**

United States District Court, E.D. Pennsylvania.

March 29, 1993.

Frank A. Labor, Asst. U.S. Atty., Philadelphia, PA, for plaintiff.

Steven Stein, Goodman, Stein & Chesnoff, Las Vegas, NV, for defendant.

## MEMORANDUM

BRODY, District Judge.

The legal issues before me in this civil forfeiture action pursuant to the drug forfeiture statute, 21 U.S.C. § 881, are:

(1) whether ownership of a vehicle evidenced by a valid claim to ownership under applicable state law is sufficient to assert the so-called innocent ownership defense under 21 U.S.C. § 881(a)(4)(C). I find sufficient ownership;

(2) whether in his effort to prevail as an innocent owner under 21 U.S.C. § 881(a)(4)(C) an attorney-claimant meets his burden of proof that he owned the vehicle without "willful blindness" to the fact that the vehicle had been used to facilitate drug trafficking when at the time he acquired title he knew that the vehicle had been owned and used by persons indicted (albeit acquitted) as members of an organization involved in the trafficking of illegal drugs and further had himself elicited testimony at a previous racketeering trial regarding the organization's trafficking of illegal drugs. I find that the claimant fails to meet his burden of establishing lack of willful blindness; and

(3) Whether a claimant can prevail as an innocent owner under 21 U.S.C. § 881(a)(4)(C) if he fails to establish lack of willful blindness but is arguably able to show lack of knowledge and lack of consent. I find that the claimant's failure to establish lack of willful blindness alone is sufficient to defeat his claim of innocent ownership.

## FINDINGS OF FACT

Following a bench trial held February 17, 1993 on the United States' complaint for civil forfeiture filed March 2, 1990,[1] and claimant's verified claim of interest filed March 15, 1990, I make the following findings of fact.

In September 1989, the Federal Bureau of Investigations ("F.B.I.") seized in Philadelphia a 1973 Rolls Royce, vehicle identification number SRH–16266 ("the Rolls Royce"), registered in Florida to Anthony "Spike" Gregorio ("Gregorio") of Fort Lauderdale, Florida. (*See* Complaint, at ¶ 5). The Rolls Royce has been impounded in Philadelphia for the duration of this civil forfeiture proceeding. (*See id.* at ¶ 6).

The government's evidence is comprised largely of information provided to it by three former members of the La Cosa Nostra ("L.C.N.") organized crime family—Philip Leonetti ("Leonetti"), Thomas DelGiorno ("DelGiorno"), and Nicholas "Nicky the Crow" Caramandi ("Caramandi")—who are now cooperating government witnesses who have on several occasions testified about the illegal activities of members of the L.C.N. crime family. (N.T. at 30–34).

The Rolls Royce was purchased in January 1986 by Nicodemo Scarfo, Sr. ("Scarfo"), boss of the L.C.N. family.[2] (N.T. at 49). Mr. Scarfo purchased the car from Cream Puff Motors in Florida for approximately $25,000. The majority of the purchase price was paid in cash, with the remainder of the price credited for a Lincoln Continental

trade-in. (N.T. at 49, 63). Mr. Scarfo had the Rolls Royce registered in Florida to Mr. Gregorio, an associate who maintained a Florida residence which Mr. Scarfo often occupied. (Exh. G–2; N.T. at 50).

In late 1985 or early 1986, Mr. Gregorio drove Mr. Scarfo, Mr. Leonetti and others in the Rolls Royce to a meeting at a Fort Lauderdale nightclub with John DiSalvo ("DiSalvo"), a drug trafficker from the Philadelphia area. At that meeting, Mr. DiSalvo told Mr. Scarfo that he would pay Mr. Scarfo $200,000 from the trafficking of phenyl–2–propanane, a methamphetamine precursor commonly known as P2P. (*See* Complaint at ¶ 11; N.T. at 45–46, 53–54).

In August 1986, Mr. Scarfo called a meeting of L.C.N. family members at the Florida residence maintained by Mr. Gregorio. One of persons who attended that meeting was Francis "Faffie" Iannarella ("Iannarella"), a "made-member" of the L.C.N. organization.[3] Mr. Iannarella flew from Philadelphia to Florida carrying $50,000 in cash collected as "street taxes" from drug traffickers.[4] In preparation for the Florida meeting, Mr. Gregorio met Mr. Iannarella at a Florida airport and transported Mr. Iannarella and the drug proceeds[5] to a Fort Lauderdale hotel in the Rolls Royce. The cash was ultimately given to Mr. Scarfo. (N.T. at 54–56).

Between 1987 and 1988, the claimant in this case, Oscar B. Goodman ("Goodman"), a

---

1. This case was transferred to me November 2, 1992.

2. The L.C.N. organization consists, hierarchically, of a boss, an underboss, several capos, a legion of soldiers, and "non-made" associates. (N.T. at 35). As the organization existed at the time relevant to this case, Mr. Scarfo was boss and Mr. Leonetti was underboss. (N.T. at 37).

3. There are "made" and "non-made" members of the L.C.N. family. An individual is initiated as a "made" member of the L.C.N. family after being proposed by an existing member, participating in certain illegal acts, and taking part in an initiation ceremony. (N.T. at 36).

4. The "street tax," also known as the "elbow" or the "shake," was money received as the direct result of demands made by L.C.N. members and their "non-made" associates upon Philadelphia

area drug dealers. Under threat of death or physical violence, the L.C.N. demanded a percentage of drug dealers' profits. Typically, the L.C.N. member collecting the "tax" would keep half the amount collected, and the other half would be delivered to Mr. Scarfo. This scheme operated in the Philadelphia area during 1985 and 1986. (N.T. at 41–47).

5. The claimant in this case disputes the characterization of the "street tax" as proceeds from drug transactions. Claimant argues that the "street tax" is proceeds from extortion of drug dealers, rather than proceeds from the trafficking of illegal drugs. The claimant suggests a distinction without a difference. Clearly money collected by the L.C.N. from drug dealers was derived, albeit indirectly, from the sale of illegal drugs. There is no reason to believe that money received in return for illegal drugs loses its proceeds status as soon as it leaves the drug dealer's pocket.

criminal defense attorney from Las Vegas, Nevada, represented Mr. Leonetti in three separate criminal trials in Philadelphia. At the first trial, in December 1987, *United States v. Nicodemo Scarfo, et al.,* 87–CR–00258, Mr. Scarfo, Mr. Leonetti and others were acquitted of federal drug charges (Exhs. G–6, G–7, G–8; N.T. at 38, 91–93, 115–16); at the second trial, in May 1988, Mr. Scarfo, Mr. Leonetti and others were acquitted in state court of murdering L.C.N. member Salvatore Testa ("Testa") (Exh. D–4; N.T. 91–94, 116–17). At the third trial, in September 1988,[6] *United States v. Nicodemo Scarfo, et al.,* 88–00003, Mr. Scarfo, Mr. Leonetti and others were found guilty in federal court of violating the Racketeer Influenced and Corrupt Organizations ("RICO") statute as well as federal drug laws. (Exhs. G–5A, G–5B, G–5C, G–9; N.T. at 28–29, 38, 117–118). The RICO and drug trafficking convictions were affirmed by the Third Circuit, *see United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990), certiorari denied, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991), and the defendants are currently serving prison sentences.

Following the jury's unexpected verdict in favor of the defendants in the Testa murder trial on May 10, 1988, the defendants' attorneys, friends, family and followers gathered at the Four Seasons Hotel in Philadelphia, where a spontaneous celebration erupted.[7] Mr. Goodman testified that "nothing was spared as far as expense," that for several hours "Cognac that ... was $800 a bottle [was] imbibed by everyone there" and "$100 bottles of champagne were being shaken like it was a World Series victory and splattered all over the wall." [8] (Exhs. D–2, D–3, D–4; N.T. at 94–102).

At the end of the evening Mr. Goodman was approached by Mr. Scarfo's son, Nicodemo Scarfo, Jr., concerning the bill for the festivities. The cost of the party exceeded $16,000, and Mr. Goodman testified that no one present at the party had sufficient funds to pay the bill. The younger Scarfo and others requested that Mr. Goodman sign for the bill, and Mr. Goodman did so.[9] (Exh. D–5,; N.T. at 97–99). All liabilities of Mr. Goodman to the Four Seasons Hotel were ultimately satisfied.[10] (N.T. at 153–165).

At some point shortly after the Four Seasons party, the younger Scarfo offered Mr. Goodman the Rolls Royce in return for Mr. Goodman's paying the Four Seasons bill. A deal was struck whereby Mr. Goodman was to receive, in return for his paying the Four Seasons bill, title to the Rolls Royce and $1,500 contributions from each of three other attorneys present at the party. (Exhs. D–6, D–7; N.T. at 99–101).

On October 5, 1988, in Las Vegas, Mr. Gregorio endorsed the title to the Rolls Royce over to Mr. Goodman. (N.T. at 102–103; Exh. D–1). It is not clear whether Mr.

---

**6.** The initial indictment on the RICO and federal drug charges in this case was returned January 11, 1988. A superseding indictment was filed June 13, 1988. (N.T. at 26–28, 39–41; Exhs. G–5A, G–9).

**7.** Neither Mr. Scarfo nor Mr. Leonetti was present at the Four Seasons party. Both remained incarcerated after the Testa acquittal pending trial of the RICO case. On January 21, 1988, approximately four months prior to the Four Seasons party, Mr. Goodman had entered an appearance on behalf of Mr. Leonetti in the federal RICO and drug trafficking case. (N.T. at 25–28, 96–97, 111–113; Exhs. G–5A, G–9).

**8.** The Four Seasons celebration is a legend among popular chroniclers of the local organized crime scene. *See* Donald Cox, *Mafia Wipe Out,* p. 272 (Exh. D–3).

**9.** It is not clear whether Mr. Goodman charged the cost of the party to his room bill, or whether the cost of the party was charged separately to Mr. Goodman's law firm's credit card. (N.T. at 121–127).

**10.** The total bill from the Four Seasons for Oscar B. Goodman, Room 855, dated June 1, 1988 for $41,260.70 was paid. (N.T. 153–65). Included on Mr. Goodman's bill were charges for attorneys David Chesnoff and Milton Grossmark, who were also involved in the Testa murder trial. (N.T. at 153–165). Mr. Goodman's bill was satisfied by the following series of disbursements:

| | | |
|---|---|---|
| $16,620.36 | OG credit card | May 16, 1988 |
| $ 5,000.00 | cash | May 16, 1988 |
| $ 5,000.00 | cash | May 24, 1988 |
| $ 5,900.00 | cash | June 1, 1988 |
| $ 7,640.34 | OG credit card | June 24, 1988 |

An additional payment of $1,100 was made, but the Four Seasons has no record of that payment. (N.T. at 153–165; Exhs. G–11, G–12).

Goodman was present in Las Vegas when Mr. Gregorio signed title to the Rolls Royce over to him. (N.T. at 103). The transfer of title from Mr. Gregorio to Mr. Goodman was never recorded. (N.T. at 133–34). On March 1, 1989, Mr. Goodman paid $4,000 for repairs to the Rolls Royce, which included stripping the vehicle of electronic surveillance devices. (Exh. D–8; N.T. at 103–107).

When the Rolls Royce was seized by the F.B.I. in Philadelphia on September 15, 1989, Mr. Goodman had not yet taken physical possession of the vehicle. (N.T. at 107). In response to the government's claim for civil forfeiture of the Rolls Royce pursuant to 21 U.S.C. § 881, Mr. Goodman filed a verified claim in interest asserting innocent ownership of the Rolls Royce pursuant to 21 U.S.C. §§ 881(a)(4)(C) and 881(a)(6).

## CONCLUSIONS OF LAW

I make the following conclusions of law:

1. The government has established probable cause that the Rolls Royce was used to facilitate illegal drug transactions under 21 U.S.C. § 881(a)(4).

2. The claimant has sufficient standing to contest forfeiture of the Rolls Royce.

3. When title was transferred to the claimant on October 5, 1988, the claimant received sufficient ownership of the Rolls Royce to assert an innocent ownership defense under 21 U.S.C. § 881(a)(4)(C).

4. The claimant had sufficient notice to signal that Mr. Scarfo and his L.C.N. associates were involved in illegal drug trafficking and that the Rolls Royce was connected to such activity to require inquiry.

5. The claimant has failed to establish that he was not willfully blind to the fact that the Rolls Royce was used to facilitate the trafficking of illegal drugs.

6. Failure to prove lack of willful blindness alone is sufficient to defeat the claimant's contention of innocent ownership under 21 U.S.C. § 881(a)(4)(C).

7. The Rolls Royce is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(4).

## DISCUSSION

### I. PROBABLE CAUSE FOR FORFEITURE

■ In a civil forfeiture proceeding pursuant to 21 U.S.C. § 881, the government has the initial burden of showing probable cause for forfeiture. *United States v. 55,518.05 in U.S. Currency*, 728 F.2d 192 (3d Cir.1984); *United States v. Parcel of Real Property Known As 6109 Grubb Road, Etc.*, 886 F.2d 618 (3d Cir.), rehearing denied, 890 F.2d 659 (3d Cir.1989). To meet its burden, the government must present information "adequate and sufficiently reliable to warrant the belief by a reasonable person that the property was used to further the trafficking of illegal narcotics." *6109 Grubb Road*, at 621. "All that is required is that a court be able to look at the 'aggregate' of the facts and find reasonable grounds to believe that the property probably was derived from drug transactions." *United States v. A Parcel of Land, Buildings, Appurtenances and Improvements, Known As 92 Buena Vista Avenue, Rumson, New Jersey, et al.*, 937 F.2d 98, 104 (3d Cir.), affirmed on other grounds, —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993).

■ The government may use hearsay evidence to establish probable cause for forfeiture. *See 6109 Grubb Road*, 886 F.2d at 621 (proof of probable cause based upon prior testimony); *92 Buena Vista Avenue*, 937 F.2d at 104 (proof of probable cause set forth in criminal indictment); *United States v. One 1986 Chevrolet Van*, 927 F.2d 39 (1st Cir. 1991) (proof of probable cause set forth in affidavit).

■ I find that the government has established probable cause that the Rolls Royce was used to facilitate illegal drug transactions. F.B.I. Agent Randal Wolverton ("Agent Wolverton") testified that "Mr. Leonetti told [him] that he, Philip Leonetti, Nicodemo Scarfo and a few other people rode in that Rolls Royce that [Agent Wolverton] seized from Mr. Scarfo's residence in Fort Lauderdale to the Yesterdays night club in Fort Lauderdale, where Mr. Scarfo met with John DiSalvo, who was a drug dealer from Philadelphia ... During this meeting Mr.

DiSalvo told Nicodemo Scarfo that DiSalvo would pay Scarfo $200,000 from the drug business." (N.T. at 54). Agent Wolverton further testified that "[i]n August of 1986, Nicodemo Scarfo summoned the members of his crime family to the Florida area. One of those summoned was Faffie Iannarella ... Mr. Iannarella travelled from Philadelphia to Fort Lauderdale by airplane and Mr. Iannarella was picked up at the airport by Spike Gregorio driving the 1973 Rolls Royce that [Agent Wolverton] seized. Mr. Iannarella was carrying with him $50,000 in cash that Mr. Iannarella obtained from another drug dealer. Mr. Iannarella was transported from the airport to the hotel in Fort Lauderdale where Mr. DelGiorno, Mr. Iannarella and other members of the Mafia were staying ... The $50,000 was eventually given to Nicodemo Scarfo." (N.T. at 55-56). I find this testimony sufficient for the government to meet its burden of probable cause to believe that the Rolls Royce was used to facilitate illegal drug transactions for purposes of forfeiture under 21 U.S.C. § 881(a)(4).[11]

To contest a forfeiture action, a claimant must have sufficient standing. *United States v. Contents of Accounts Nos. 3034504504 and 144-07143 at Merrill, Lynch, Pierce, Fenner and Smith, Inc.,* 971 F.2d 974, 987-88 (3d Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). Any "colorable owner of the *res* or ... any colorable possessory inter-

est in it" will satisfy the standing requirement. *Id.* at 987.

Mr. Goodman testified that he received the Rolls Royce in return for paying the bill for a party at the Four Seasons (N.T. at 99–103), and Mr. Gregorio signed title to the Rolls Royce over to Mr. Goodman.[12] Clearly Mr. Goodman has a colorable interest in the Rolls Royce to support standing to contest its forfeiture.

## II. THE INNOCENT OWNER DEFENSE

Once the government has established probable cause for forfeiture, the burden of proof shifts to the claimant to prove, by a preponderance of the evidence, that he qualifies as an "innocent owner."[13] *See United States v. 6109 Grubb Road,* 886 F.2d 618, 623–26 (3d Cir.1989); *United States v. RD 1, Box 1, Thompsontown,* 952 F.2d 53, 56 (3d Cir.1992).

### A. The Claimant has Sufficient Ownership to Assert the Innocent Ownership Defense.

A threshold question to the innocent ownership defense is whether the claimant has sufficient ownership interest in the seized property to assert the defense. *92 Buena Vista Avenue,* —— U.S. at ——, 113 S.Ct. at 1134. In *92 Buena Vista Avenue,* the United States Supreme Court, affirming the Third Circuit, held that because "the

---

**11.** The government may also have shown probable cause that the Rolls Royce was purchased with proceeds from illegal drug transactions sufficient to support forfeiture pursuant to 21 U.S.C. § 881(a)(6). The F.B.I.'s investigation of Mr. Scarfo during the period 1985–1986 led it to conclude that Mr. Scarfo had no legitimate income during the period in which the Rolls Royce was purchased. (N.T. at 47). Agent Wolverton testified that "Mr. Scarfo purchased the car from money described by Mr. Leonetti as from the shakes ... [f]rom the street tax or the elbow." (N.T. at 49). Although the F.B.I. was aware that Mr. Leonetti, Mr. Scarfo and others were involved with an Atlantic City, New Jersey concrete entity known as Scarf, Inc., and that Mr. Scarfo and Mr. Leonetti took very seriously suggestions that the concern was not legitimate (N.T. 60–63), there was no actual proof of legitimate income from Scarf, Inc., or any other source, for Mr. Scarfo, Mr. Leonetti or other L.C.N. members.

Because I find the government's showing on its facilitation claim sufficient to support forfeiture of the Rolls Royce, however, I need not address the proceeds aspect of the case in further detail.

**12.** See discussion *infra* regarding the effect of the title endorsement under applicable state law on Mr. Goodman's innocent ownership claim.

**13.** The innocent ownership defense to claims for forfeiture of conveyances used or intended for use to facilitate drug transactions provides, in relevant part:

no conveyance shall be forfeited under this paragraph to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner.

21 U.S.C. § 881(a)(4)(C).

term 'owner' is used three times [in the statute] and each time it is unqualified ... [s]uch language is sufficiently unambiguous to foreclose any contention that it applies only to bona fide purchasers." *Id.* The claimant in *92 Buena Vista Avenue* obtained her ownership interest in the seized property simply as a gift, and the Supreme Court held that sufficient for her to assert an innocent ownership claim to the property. *Id.* at ——, 113 S.Ct. at 1130.

■ Here Mr. Gregorio signed title to the Rolls Royce over to Mr. Goodman in Las Vegas, Nevada on October 5, 1988 (N.T. at 102–103; Exh. D–1), but never recorded that certificate with the state. (N.T. at 133–34). Under Florida law,[14] "a person acquiring a motor vehicle ... from the owner thereof ... shall not acquire marketable title to the motor vehicle ... until he has had issued to him a certificate of title to the motor vehicle." Fla.Stat. ch. 319.22. Although Florida law requires motor vehicle titles to be recorded, *see* Fla.Stat. ch. 319.03, Florida does not "subscribe to the view that the owner of an

automobile should be held to have lost his property, or should be precluded from showing that he does in fact own it, simply because he did not within the ten days after the purchase present the assigned certificate to the State Motor Vehicle Commissioner as required by [statute]." *Nash Miami Motors, Inc. v. Bandel, et al.,* 47 So.2d 701 (Fla.1950).[15]

Because Mr. Goodman received title to the Rolls Royce on October 5, 1988, he became an owner of the Rolls Royce as of that date.[16] Under Florida law, since title was not recorded, a lienholder could have an interest superior to that of Mr. Goodman. *In the Matter of Canup Mechanical, Inc.,* 1 B.R. 703 (Bkrtcy.M.D.Fla.1979) (Florida law allowed creditor to obtain lien on vehicle superior to the rights of vehicle's owner prior to owner's recording title with the state). The only challenge to Mr. Goodman's ownership in this action, however, comes from the United States. The Supreme Court in *92 Buena Vista Avenue* held that the government "can-

14. Applicable state law is employed to define the nature of the property ownership interest. *See, e.g., United States v. Parcel of Real Property Known As 1500 Lincoln Avenue,* 949 F.2d 73, 77 (3d Cir.1991) (state law defined property interest where innocent owner held property with her husband as tenants by the entireties); *United States v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Avenue,* 894 F.2d 1511, 1517 (11th Cir.1990) (In the absence of specific congressional action, Supreme Court pronouncements make clear that state law will govern property rights, even where federal statutes are involved.) (Citations omitted.)

15. Although Florida courts have interpreted the Florida motor vehicle registration statute to preclude assertion of an innocent owner defense under Florida's drug forfeiture statute, *see Lamar v. Wheels Unlimited, Inc.,* 513 So.2d 135, 137 (Fla.1987) ("the term 'owner' with respect to motor vehicles being forfeited under Florida Contraband Forfeiture Act is limited to one who has obtained title certificate pursuant to chapter 319 ..."), federal forfeiture law preempts state forfeiture law where "state law and federal law are in actual conflict so that ... state law obstructs the accomplishment of the full objectives of Congress." *United States v. One Single Family Residence,* 894 F.2d 1511 (11th Cir.1990). In light of Congress' intent in passing the federal forfeiture statute to punish criminals while ensuring that innocent people are not punished for

unwitting association with wrongdoers, *see id.* at 1513, the federal forfeiture statute preempts Florida forfeiture law.

16. The claimant argued at trial that it was the promise by the younger Mr. Scarfo after the Four Seasons party that gave rise to his ownership interest in the Rolls Royce, and therefore his ownership predates the filing of the RICO indictment and the allegations therein regarding drug trafficking. (N.T. at 19–20). This is not true both legally and factually. Legally, promises made by the younger Mr. Scarfo after the Four Seasons party would be insufficient, under applicable Pennsylvania law, to vest Mr. Goodman with ownership sufficient to support standing to assert an innocent ownership defense to civil forfeiture. *See Shapley v. Commonwealth,* 150 Pa.Cmwlth. 106, 615 A.2d 827 (Pa.Cmwlth.1992) (claimant must have possessory interest in property with attendant characteristics of dominion and control to establish ownership in state drug forfeiture proceeding); *One Single Family Residence,* 894 F.2d at 1517 (state law will govern property rights so long as there is no actual conflict between the two). Factually, the initial RICO indictment was returned January 11, 1988, four months before the Four Seasons party. (N.T. at 26–28, 39–41; Exhs. G–5A, G–9). At the time of the Four Seasons party on May 10, 1988, the claimant had already entered an appearance on behalf of Mr. Leonetti in the RICO case (Exh. G–9) and presumably had examined the indictment.

not profit from the statutory version of the [relation back doctrine] in § 881(h) until [the claimant] has had the chance to invoke and offer evidence to support the innocent owner defense ..." —— U.S. at ——, 113 S.Ct. at 1137. Thus the government does not have an interest at this time with which to challenge Mr. Goodman's ownership. Clearly under *92 Buena Vista Avenue* Mr. Goodman is an owner whose ownership interest is sufficient to assert an innocent owner defense.

### B. The Claimant Fails to Meet his Burden of Lack of Willful Blindness under 21 U.S.C. § 881(a)(4)(C).

Having found that Mr. Goodman has sufficient ownership interest in the Rolls Royce to assert the innocent ownership defense, I must now determine whether Mr. Goodman satisfies the statutory requirements of that defense. The innocent ownership defense saves from forfeiture a vehicle used to facilitate drug trafficking if the owner can establish that the illegal activity was committed without the knowledge, consent, or willful blindness of the owner. 21 U.S.C. § 881(a)(4)(C).

■ Lack of willful blindness sufficient to prevail as an innocent owner under § 881(a)(4)(C) means that a claimant must show that he or she has not ignored a signal or suggestion that a vehicle might have been used to facilitate the trafficking of illegal drugs. Such a suggestion might arise from the fact that the vehicle was owned by one accused of drug trafficking. As in this case, once the claimant chooses to ignore the signal, he or she can no longer establish lack of willful blindness to the prior use of the vehicle that would subject it to forfeiture.

This case presents the requirements of willful blindness as a matter of first impression in the Third Circuit. The interpretations of courts in other circuits, however, are consistent with my reading of the statute. The Eighth Circuit in *United States v. One 1989 Jeep Wagoneer,* 976 F.2d 1172, 1175 (8th Cir.1992), a facilitation case in which the claimant asserted willful blindness under § 881(a)(4)(C), held that "willful blindness involves an owner who deliberately closes his eyes to what otherwise would have been obvious and whose acts or omissions show a conscious purpose to avoid knowing the truth." A Texas district court held, in a case in which an attorney claimed innocent ownership of a seized vehicle as his fee, that under the willful blindness standard the "claimant at least has the responsibility to take the basic investigatory steps necessary to determine that his fees were not being satisfied with a major instrumentality of the crime charged against his client." *United States v. 1977 Porsche Carrera 911,* 748 F.Supp. 1180, 1186 (W.D.Tx.1990), affirmed on other grounds, 946 F.2d 30 (5th Cir.1991).

This reading of willful blindness is true to Congress' intention in including that language in the innocent ownership defense it added to § 881(a)(4) in 1988. The bill was initially introduced in the House of Representatives without the willful blindness language, 134 Cong.Rec. 22,653, 22,672, but members of Congress thought the amendment "would lead to a 'look-the-other-way' defense." 134 Cong.Rec. 24,086 (statement of Rep. Archer). It was feared that "owners will be encouraged ... to know as little about their property as possible ..." *Id.* (statement of Rep. Gibbons). It was in this context that willful blindness was added to the bill, 134 Cong.Rec. 33,193, and the additional language was described as "address[ing] the cases of individuals who have demonstrated a conscious purpose to avoid the truth." 134 Cong.Rec. 33,288 (statement of Rep. Young). *See also* 134 Cong.Rec. 33,313 (statement of Rep. Jones) ("[T]hese provisions will provide significant legal rights for the innocent, but still ensure that the guilty will be punished."); 134 Cong.Rec. 33,315 (statement of Rep. Davis).

The extensive and prominent role forfeiture has played in this country's jurisprudence also supports my reading of willful blindness. From colonial times until relatively recent years, the common law allowed forfeiture of property used in the commission of criminal activity, and there was no defense for innocent owners of forfeited property. *See 92 Buena Vista Avenue,* —— U.S. at ————, 113 S.Ct. at 1131–34. When Congress added the innocent ownership defense to the various provisions of the drug

forfeiture statute, it was in abrogation of this common law history, and I am well advised by the Supreme Court to "approach the task of construing [that amendment] with caution." *Id.* at ——, 113 S.Ct. at 1134. My reading of willful blindness does the least offense to a protection that would-be innocent owners historically did not enjoy at common law.

■ I find that Mr. Goodman has failed to prove that he was not willfully blind to— *i.e.,* that knowing what he did about the illegal activities of Mr. Scarfo and Mr. Leonetti, he did not consciously avoid knowledge of—the use of the Rolls Royce to facilitate trafficking of illegal drugs.

By his own testimony, Mr. Goodman admitted he "didn't care [whose car it was], all [he] wanted was to get recompensed for the monies that [he] laid out," (N.T. at 151), and, when asked if he pursued the reason the car was titled in Mr. Gregorio's name, Mr. Goodman responded, "No. I didn't care." (N.T. at 152).

Mr. Goodman was present—indeed, he represented Mr. Leonetti—at the federal drug trial of Mr. Scarfo, Mr. Leonetti and others in 1987. Mr. Goodman testified that his "first involvement with Mr. Leonetti as his attorney was representing him in the drug case where there were allegations that he was part of [a] continuing criminal enterprise and actually participated in the conspiracy and possession of P2P and methamphetamine and the various drug violations concerning methamphetamine. We went to trial on that case in this courthouse, the jury returned a verdict of not guilty on all of those charges involving actual participation in drug offenses." (N.T. at 92; Exh. G–6). While it is true that Mr. Scarfo and his associates were ultimately acquitted of federal drug charges in the 1987 drug case, that does not prevent Mr. Goodman from being on notice to the possibility of the use of the Rolls Royce to facilitate drug trafficking. Further it does not absolve Mr. Goodman of

his burden to make an independent inquiry as to the use of the Rolls Royce.

Former L.C.N. member Caramandi testified in the 1987 drug case, at which Mr. Goodman was present, that the L.C.N.'s unwritten rule against involvement in drugs was, at Mr. Scarfo's direction, honored in the breach. (Exh. G–7 at pp. 20–21; N.T. at 139–140). At the same 1987 drug trial, former L.C.N. member DelGiorno testified at length concerning the L.C.N.'s involvement in the trafficking of illegal drugs. (Exh. G–8 at pp. 114–124).

Finally, at a trial held in this court on March 31, 1987, at which Mr. Goodman defended former Philadelphia City Council member Leland Beloff against racketeering charges, Mr. Goodman elicited on cross examination detailed information from Mr. DelGiorno regarding the L.C.N.'s involvement in illegal drug trafficking. (N.T. at 136–138). At the Beloff trial on March 31, 1987, Mr. Goodman conducted, under an ethical obligation not to elicit false testimony,[17] the following cross examination:

Mr. Goodman: Did you attempt to extort Steven Vento, Jr.?

Mr. DelGiorno: I sent somebody. No, I didn't personally attempt to distort (sic) him.

Mr. Goodman: Who did you send?

Mr. DelGiorno: We attempted to extort him.

Mr. Goodman: Who is we?

Mr. DelGiorno: The Crow, the family, we sent the Crow. He, like me, also did these things under direction.

Mr. Goodman: So, you directed him to extort Mr. Vento?

Mr. DelGiorno: After I was directed to do it I directed him.

Mr. Goodman: That was for the purpose of getting involved in a methamphetamine business?

Mr. DelGiorno: Yes, it was.

---

**17.** As a licensed attorney, Mr. Goodman is prohibited by professional rules of conduct from offering testimony he knows to be perjured or evidence he knows to be false. *See* DR–7–102(a)(4), Pennsylvania Code of Professional Responsibility; Rule 3.3, Pennsylvania Rules of Professional Conduct. *See also* Local Rule 14(IV)(B) (adopting the Pennsylvania Rules of Professional Conduct for the Eastern District of Pennsylvania).

Mr. Goodman: You got involved in the business, didn't you?

Mr. DelGiorno: Yes, I did.

Mr. Goodman: You were involved in a conspiracy to import approximately 100 gallons of P2P from Europe, right?

Mr. DelGiorno: Right.

Mr. Goodman: And you made yourself a lot of money with that, didn't you?

Mr. DelGiorno: We made a lot of money.

Mr. Goodman: How much money did you make?

Mr. DelGiorno: Did I make personally?

Mr. Goodman: Yes.

Mr. DelGiorno: About 2,000.

Mr. Goodman: How about closer to 250,000?

Mr. DelGiorno: That is, about 200,000.

(N.T. at 137–138).

In light of all the foregoing, I find Mr. Goodman's testimony that, as far as he knew, the L.C.N. "abhorred" the trafficking of illegal drugs (N.T. at 108), that "if you accused [L.C.N. members] of drugs, the hackles went up," (N.T. at 109), and that he had absolutely no indication the Rolls Royce was ever utilized to facilitate illegal drug trafficking (N.T. at 109) incredible. Mr. Goodman concedes he had reason to know that Mr. Leonetti and Mr. Scarfo may have been involved in illegal activity,[18] but contends that he should nevertheless prevail as an innocent owner under § 881(a)(4)(C) because he was not willfully blind to the use of this particular 1973 Rolls Royce to facilitate drug trafficking. (N.T. at 204). Mr. Goodman misconstrues the willful blindness standard. I find that Mr. Goodman has failed to meet his burden of proving

lack of willful blindness as required by 21 U.S.C. § 881(a)(4)(C).

**C. Failure to Prove Lack of Willful Blindness Alone Is Sufficient to Defeat the Claimant's Innocent Ownership Claim.**

■■■ Once Mr. Goodman fails to meet his burden of proving lack of willful blindness as required by 21 U.S.C. § 881(a)(4)(C), does he lose his status as an innocent owner, or does he have a second bite at the apple to try to establish either lack of knowledge or lack of consent? *6109 Grubb Road* suggests that he might. 886 F.2d at 626. I conclude otherwise.

The Third Circuit in *6109 Grubb Road* allowed a claimant to prevail on an innocent owner defense under the real property provision of the drug forfeiture statute, 21 U.S.C. § 881(a)(7),[19] by proving that the illegal use of the property occurred either without the claimant's knowledge or without the claimant's consent. The case before me is not a real property case brought under § 881(a)(7), but rather a facilitation case brought under § 881(a)(4). The government contends that *6109 Grubb Road* does not apply at all to the present case, *see* United States' Post Trial Memorandum of Law, at pp. 2, 6–11, and the claimant fails to address how *6109 Grubb Road* effects the lack of willful blindness standard which the claimant must satisfy. *See* Claimant's Supplemental Brief, at pp. 3–4. Based on a careful reading of § 881(a)(4)(C) and its history, I conclude that the analysis of *6109 Grubb Road* does not apply in this case.

---

**18.** In his closing remarks, counsel for Mr. Goodman stated the following:

> Did [Mr. Goodman] have reason to know that [the Rolls Royce] was utilized in such a fashion as to make it forfeitable? I don't think so under the totality of the testimony. Did [Mr. Goodman] have reason to know that Mr. Leonetti and Mr. Scarfo may be involved in illegal activity? Yeah.

(N.T. at 204).

**19.** The real property provision of the drug forfeiture statute provides for the forfeiture of:

> All real property, including any right, title, and interest (including any leasehold interest) in

the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a)(7).

In 1988, Congress amended § 881(a)(4) to add an innocent ownership defense. *See* Historical Notes following 21 U.S.C. § 881(a)(4)(C). Unlike the innocent ownership defenses added in earlier years to the proceeds (21 U.S.C. § 881(a)(6)) and real property (21 U.S.C. § 881(a)(7)) provisions of the drug forfeiture statute, however, Congress chose to add to the facilitation provision an innocent ownership defense that introduces "willful blindness" in addition to "knowledge" and "consent."

The Third Circuit noted in *6109 Grubb Road* that "Congress does not generally place language in a statute without purpose." 886 F.2d at 625–26, citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("in construing a statute we are obliged to give effect, if possible, to every word Congress used.") The additional words "willful blindness" cannot be given effect if the innocent ownership defense of § 881(a)(4)(C) is interpreted the way the Third Circuit interpreted the real property innocent ownership defense of § 881(a)(7) in *6109 Grubb Road.* If a claimant were able to prevail under § 881(a)(4)(C)—as extension of the *6109 Grubb Road* analysis to that provision would have it—by showing either lack of knowledge or lack of consent or lack of willful blindness, then the words "willful blindness" represent nothing more than a useless third bite at the apple. Surely Congress did not intend to add a more stringent standard of lack of guilty knowledge to a statutory provision that would already allow claimants to prevail simply by satisfying one of two lesser alternative standards. Thus I find that § 881(a)(4)(C) requires that once a claimant fails to prove lack of willful blindness, the claimant can no longer prevail as an innocent owner and avoid forfeiture under that provision of the statute.

If Mr. Goodman's conscious avoidance of the truth shielded from forfeiture the Rolls Royce in this case, Mr. Scarfo and others convicted of trafficking illegal drugs would have a safe and easy haven for their expensive cars, yachts and airplanes while they served their sentences in prison. Fortunately the law is otherwise.

## CONCLUSION

For all the reasons presented, I find that the Rolls Royce that is the defendant in this case is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(4).