

1994 Decisions

Opinions of the United States Court of Appeals for the Third Circuit

11-25-1994

# United States v. One 1973 Rolls Royce

Precedential or Non-Precedential:

Docket 93-1417

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States v. One 1973 Rolls Royce" (1994). *1994 Decisions.* Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 93-1417
_____

UNITED STATES OF AMERICA,

Appellee

v.

ONE 1973 ROLLS ROYCE, V.I.N. SRH-16266,
(by and through Claimant Oscar B. Goodman),

Appellant
----------------------------------

NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,

Amicus-curiae

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 90-01487)

_____

Argued: December 6, 1993

Before: BECKER, NYGAARD, and WEIS, Circuit Judges.

(Filed:  November 25, 1994)

MICHAEL R. STILES
United States Attorney
WALTER S. BATTY, JR.
Assistant U.S. Attorney
Chief of Appeals
JOEL M. FRIEDMAN
Assistant U.S. Attorney
FRANK A. LABOR, III (ARGUED)
Assistant U.S. Attorney
615 Chestnut Street
Philadelphia, PA  19106

Attorneys for Appellee
United States of America

DAVID CHESNOFF, ESQUIRE (ARGUED)
Goodman & Chesnoff
520 South Fourth Street
Las Vegas, Nevada  89101

STEPHEN STEIN, ESQUIRE
520 South Fourth Street
Las Vegas, Nevada  89101

ROBERT E. MURDOCK, ESQUIRE
Murdock & Palazzo
520 South Fourth Street
Las Vegas, Nevada  89101

Attorneys for Appellant
One 1973 Rolls Royce
VIN SRH-16266


PETER GOLDBERGER, ESQ. (ARGUED)
50 Rittenhouse Place
Ardmore, PA   19003-2276

Attorney for Amicus-curiae
National Association of
Criminal Defense Lawyers

---

**OPINION OF THE COURT**

---


BECKER, Circuit Judge.

## I.  INTRODUCTION AND OVERVIEW

The Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881 et. seq., provides, among other things, for civil forfeiture of illegal drug related property.  Section 881 authorizes the government to seize illegal drugs, containers of illegal drugs, records associated with illegal drugs, and other

property associated with or purchased with proceeds derived from the distribution of illegal drugs. Section 881 has become attractive to prosecutors because it permits them to seize property involved in drug trafficking merely upon a showing of probable cause that the property was used to help facilitate a drug transaction.

Three subsections of § 881 have emerged as far-reaching tools of the civil forfeiture scheme. Section 881(a)(4) provides for forfeiture of "conveyances" (airplanes, automobiles, boats, etc.) used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of a controlled substance. 21 U.S.C. § 881(a)(4). Section 881(a)(6) provides for forfeiture of "all proceeds traceable" to a drug transaction. 21 U.S.C. § 881(a)(6). And § 881(a)(7) provides for forfeiture of "all real property" which is used or intended to be used to facilitate an illegal exchange of a controlled substance. 21 U.S.C. § 881(a)(7).

Congress' decision to add §§ 881(a)(4), (6), and (7) to the forfeiture scheme signalled a dramatic expansion of the government's forfeiture power. Previously, forfeiture had been limited to the illegal substances themselves and the instruments by which they were manufactured and distributed. But §§ 881(a)(4), (6) and (7) gave the government the power to seize property that by all appearances was legitimate. This development gave rise to the possibility that owners who had innocently leased or loaned property to others could lose that property in a forfeiture proceeding. For example, a landlord

might forfeit an apartment complex if a tenant was caught dealing drugs from an apartment, or a father who had loaned his son the family car might lose it if the son were caught transporting drugs therein.

To ameliorate this problem, Congress engrafted an "innocent owner" defense to forfeiture under §§ 881(a)(4), (6), and (7). The "innocent owner" defenses under §§ (a)(6) and (7) are the same: no owner's interest in property may be forfeited "by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. §§ 881(a)(6), (7). Congress later added the innocent owner defense of § 881(a)(4), and it has a slightly different formulation: no owner's interest in a "conveyance" shall be forfeited "by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner." 21 U.S.C. § 881(a)(4)(C) (emphasis supplied).

The overarching issue in this appeal is the extent to which the "willful blindness" language found in § 881(a)(4)(C) requires us to interpret that innocent owner defense differently from the otherwise identical defenses in §§ 881(a)(6) and (7). Specifically, we must first determine what constitutes "willful blindness" as that term is used in § 881(a)(4)(C). We must then decide whether an owner can claim innocent owner status under (a)(4)(E) by showing that he or she lacked either knowledge or consent or willful blindness, which, in turn, requires us to determine the extent to which the rule in this Circuit that an

owner need only show either lack of knowledge or lack of consent to make out the innocent owner defense in the context of § 881(a)(7), see United States v. Parcel of Real Property Known As 6109 Grubb Road, 886 F.2d 618, 623-626 (3d Cir. 1989), controls our interpretation of the defense in the context of § 881(a)(4)(C).

This case arises out of the seizure of a Rolls Royce automobile owned by Oscar B. Goodman, a prominent criminal defense lawyer who represents clients throughout the country. Nicodemo Scarfo, Sr. a former client of Goodman's (and at one time the reputed head of the Philadelphia branch of La Cosa Nostra ("LCN")), gave Goodman the Rolls Royce in repayment for $16,000 that Goodman had paid to the Four Seasons Hotel in Philadelphia to cover the cost of a lavish party given by Scarfo's son and his friends at the hotel to celebrate Scarfo's acquittal at a murder trial in which Goodman was one of the defense counsel.

In 1989, the FBI seized the vehicle pursuant to § 881(a)(4). The agency contended that members of the Scarfo family had used the Rolls Royce to shuttle people to and from meetings conducted as part of the Scarfo LCN family's drug distribution activities. Goodman filed a verified claim asserting innocent ownership pursuant to § 881(a)(4)(C). Goodman alleged that he did not know about, did not consent to, and was not willfully blind to the car's use in drug transactions. After a bench trial the district court rejected Goodman's innocent

owner claim and held that the Rolls Royce was subject to forfeiture.

On appeal, Goodman raises two principal challenges to the district court's decision. First, he contends that the district court incorrectly held that he had failed to prove that he lacked willful blindness. Goodman submits that, by holding that Goodman was willfully blind because he failed to exercise due care to ascertain whether the car had been used to facilitate a drug transaction, the district court improperly read willful blindness as a negligence provision. The proper standard, Goodman argues, is not an objective "due care" standard but rather requires a subjective inquiry, such as "deliberate ignorance" or "conscious avoidance."

Second, Goodman claims that the district court improperly concluded that his failure to prove lack of willful blindness, standing alone, defeated his innocent ownership defense. According to Goodman, he is entitled to innocent ownership protection even if he knew or was willfully blind to the fact that the Rolls Royce had been used to facilitate a drug transaction so long as he shows that he did not consent to its use therefor. He argues that our decision in 6109 Grubb Road, 886 F.2d at 618, which held that under § 881(a)(7) an innocent owner defense would lie if the owner showed either lack of knowledge or lack of consent, mandates such a result. He reasons that since the innocent owner provision of § 881(a)(7) is virtually identical to that in § 881(a)(4)(C), he was entitled to show that, notwithstanding his willful blindness, he was an

innocent owner because he did not consent to the Rolls Royce's use in the pre-transfer drug transactions.

Goodman's first challenge to the district court's decision requires us to articulate the meaning of willful blindness under § 881(a)(4)(C). Although it is not clear from its opinion, it appears that the district court may have defined willful blindness in terms of an objective "due care" standard, i.e., the owner's failure to exercise due care to discover whether the car was tainted. To the extent that the district court applied an objective standard in determining whether Goodman was willfully blind, it erred, for we believe that the appropriate standard for willful blindness is the traditional subjective standard articulated in United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985). Under that standard, a person is willfully blind for purposes of § 881(a)(4)(C) when he or she is aware of a high probability that the conveyance was used to facilitate a drug transaction but fails to take reasonable affirmative measures to find out whether the conveyance was in fact so used. Thus, for Goodman to escape the willful blindness prong of § 881(a)(4)(C), he needs to show either 1) that subjectively he did not recognize the high probability that the vehicle was connected to a drug transaction, or 2) that he took reasonable steps under the circumstances to learn whether the vehicle had actually been used to facilitate a drug transaction. Because we cannot be sure that the district court applied this standard, we will vacate the judgment of forfeiture and remand for reconsideration.

Goodman's second challenge, relating to consent, raises a number of thorny issues. Our conclusion, however, is straightforward. We conclude that the rationale of 6109 Grubb Road applies perforce to forfeitures under § 881(a)(4)(C), and that Goodman will be an innocent owner notwithstanding any knowledge or willful blindness he may have had if he did not consent to the use of the Rolls Royce in connection with drug transactions. Thus, assuming that Goodman can convince the factfinder that he did not own the Rolls Royce at the time it was used to facilitate a drug transaction, and was not otherwise in a position to prevent such a use of the car, he will have shown that he did not consent to its use to facilitate drug transactions and hence will be entitled to innocent owner status.

While our conclusion on this point is simple to state, it has far-reaching implications which raise a number of troubling issues about 6109 Grubb Road and the wording of the innocent owner defense in the forfeiture statutes. The 6109 Grubb Road approach essentially precludes forfeiture of property that is owned by persons who: 1) obtained an interest in the property after the illegal use; and 2) lacked knowledge about its illegal use at the time the illegal use occurred. Under 6109 Grubb Road, a post-illegal-act transferee who did not know about the act that created the taint at the time it occurred will be an innocent owner even if he or she knew about the taint at the time he or she received the property.

Given this result, the government asks that we decline to extend 6109 Grubb Road to forfeitures under § 881(a)(4)(C).

But the government can point to no principled basis for distinguishing § 881(a)(4) from § 881(a)(7) for purposes of applying 6109 Grubb Road. Had Scarfo satisfied his debt to Goodman by giving him a house instead of a car, the nature of the problem would be the same, notwithstanding that the government would need to seek forfeiture pursuant to subsection § 881(a)(7) instead of § 881(a)(4)(C). Our comparison of the structure and language of §§ 881(a)(4) and (7) and analysis of 6109 Grubb Road lead us to conclude that the 6109 Grubb Road construction of the statute applies by analogy to § 881(a)(4)(C).

While 6109 Grubb Road (which is binding on us absent in banc reconsideration under this court's internal operating procedures) has its detractors, see United States v. Parcel of Real Property Known as 6109 Grubb Road, 890 F.2d 659 (3d Cir. 1989) (sur petition for rehearing) (Greenberg, J., dissenting), its disjunctive approach ameliorates some of the harsh, and quite unfair, results that would occur under the alternative to its construction, i.e., a "conjunctive" construction requiring the owner show both a lack of knowledge and a lack of consent. Specifically, 6109 Grubb Road allows an owner to keep his or her property when he or she has not consented to the illegal use by taking all reasonable affirmative steps to prevent it. To discard the 6109 Grubb Road disjunctive construction in favor of a conjunctive one might prevent the problem we confront now, but it would create another one. A conjunctive construction would deprive innocent owner status to owners who know their property is being improperly used but are

unable to put a stop to it despite having taken all reasonable steps to do so -- a result which could raise due process concerns.  See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 688-90, 94 S. Ct. 2080, 2094-95 (1974).

Although there is no discussion in 6109 Grubb Road of the problem that the disjunctive construction creates when the statute is applied to post-illegal-act transferees, its absence is not surprising.  At the time 6109 Grubb Road was decided, it was presumed that a post-illegal-act transferee could never raise the innocent owner defense because the relation back provision of the civil forfeiture statute, 21 U.S.C. § 881(h), vested title in the United States at the time of the illegal act, and thus a post-illegal-act transferee could never be an owner.  That background presumption changed, however, when the Supreme Court held in United States v. Parcel of Land, Buildings, Appurtenances & Improvements at 92 Buena Vista Avenue, Rumson, N.J., 113 S. Ct. 1126 (1993), that § 881(h) did not deprive post-illegal-act transferees an opportunity to raise the innocent owner defense.  In a sense, then, 92 Buena Vista Avenue, and not 6109 Grubb Road, creates the problem we face today.

We believe that, in the wake of 92 Buena Vista Avenue, a real ambiguity exists in the statutory language as read by 6109 Grubb Road.  Because the civil forfeiture statute is punitive in nature, we rely on the rule of lenity to resolve the ambiguity in favor of the claimant.  We understand that a countervailing maxim requires us to construe the statute to avoid an absurd result.  But we do not think the result we reach is absurd.  As we discuss

in more detail in the main body of the opinion, language in 92 Buena Vista Avenue raises considerable doubt as to whether the forfeiture statutes are meant to reach post-illegal-act transferees who did not know about the act causing the taint until after it transpired.

As a matter of policy choice, it may be that the forfeiture laws should apply differently depending on whether a claimant obtained the property before or after the events that created the taint, but the statute, as currently drafted, fails to account for the differences between the two classes of claimants. The remedy for this problem, however, should not be a schizophrenic reading of the statutory text, for policy choices are not for us to make. Rather, the remedy should be Congressional action. Until then we will apply 6109 Grubb Road, which, as we apply it today, makes the reasonable choice of protecting post-illegal-act owners from the oppressive application of the forfeiture laws.

## II. FACTS AND PROCEDURAL HISTORY

### A. The Rolls Royce, and Goodman's Knowledge of Its Use

In January 1976, Scarfo purchased the 1973 Rolls Royce from Cream Puff Motors in Palm Beach, Florida. The purchase price was $25,000, most of which was paid in cash, although part was paid with a trade-in of a Lincoln Continental. Scarfo had the car registered in Florida to Anthony Gregorio, an associate of Scarfo who lived in Fort Lauderdale.

Shortly after Scarfo bought the vehicle, it was used on two occasions to facilitate drug trafficking. On the first occasion, in early 1986, Gregorio drove Scarfo, Phillip Leonetti (the "underboss" of the Scarfo LCN family), and some others from Scarfo's vacation home to a nightclub in Fort Lauderdale to meet with John DiSalvo, a drug dealer from Philadelphia involved in trafficking phenyl-2-propanane, a raw material used to manufacture methamphetamine. At that meeting, DiSalvo promised to pay Scarfo $200,000 in "street taxes" so that he could operate his drug business without interference from the Scarfo LCN family. On the second occasion, in August 1986, Scarfo called a meeting of his LCN family members at either his or Gregorio's home in Fort Lauderdale. Francis Ianarella, a "capo" in the Scarfo LCN family, came to the meeting. He flew in from Philadelphia and Gregorio picked him up at the airport in the Rolls Royce and drove him to a hotel. Not only was Ianarella in Florida to attend the meeting, but he was also bringing $50,000 in "street taxes" from drug traffickers in the Philadelphia area. The $50,000 was ultimately given to Scarfo.

By 1987, the FBI had developed enough evidence against the Scarfo LCN organization to crack down on its activities. In early 1987, the government initiated a series of prosecutions relating to the Scarfo LCN family. Goodman was involved as counsel in a number of them. In the first trial, Goodman represented former Philadelphia City Councilman Leland Beloff, who was accused, along with Scarfo, of engaging in a scheme to commit extortion upon a real estate developer. See United States

v. Scarfo, 850 F.2d 1015 (3d Cir.), cert. denied, 488 U.S. 910 (1988).  During that trial, Goodman cross-examined Thomas DelGiorno -- one of the government's key cooperating witnesses -- and during that cross-examination, Goodman forced DelGiorno to admit that the Scarfo LCN family engaged in drug trafficking. The government contends that this cross-examination put Goodman on notice that the Scarfo LCN family was engaged in that activity.

Following the extortion trial, the government attacked Scarfo's organization directly, and in 1987 indicted members of the organization, including Scarfo, on federal drug charges. Goodman represented Leonetti in the ensuing trial.  During the trial, DelGiorno and Nicholas Caramandi testified for the government.  DelGiorno testified at length about the Scarfo organization's involvement in drugs.  Caramandi stated that, although the Scarfo LCN family had a rule against trafficking in drugs, the rule was routinely broken, and that Scarfo ordered his family members to get money from drug dealers any way they could. A jury acquitted Scarfo, Leonetti, and a few others of the charges.

In May 1988, the Commonwealth of Pennsylvania began its own prosecution of Scarfo.  It ultimately tried Scarfo and Leonetti for the murder of Salvatore Testa.  Testa, who had been the boss of the Philadelphia LCN (Scarfo was his "consigliere" at the time), had died when a bomb exploded in his house in early 1981.  Goodman and his fellow defense attorneys won an acquittal for both Scarfo and Leonetti.

After the jury's unexpected verdict in the Testa murder case, the defendants' attorneys, friends, and family met at the Four Seasons Hotel in Philadelphia. A wild celebration ensued. According to Goodman, "nothing was spared as far as expense." For several hours "Cognac that . . . was $800 a bottle [was] imbibed by everyone there," and "$100 bottles of champagne were being shaken as if it was a World Series victory and splattered all over the wall." At the end of the evening, however, no one in Scarfo's family had the money to pay the $16,000 bill, and when Nicodemo Scarfo, Jr. approached Goodman and asked him to pay, Goodman agreed. Shortly after the Four Seasons party, Goodman accepted Scarfo Jr.'s offer to repay Goodman with the Rolls Royce and $1,500 from each of the three other attorneys present at the party.

Eventually, the federal government convinced a grand jury to indict Scarfo, Leonetti, and others in the Scarfo LCN family for RICO violations. In September 1988, a two-month RICO trial began. Goodman again represented Leonetti. This time, the jury convicted Scarfo, Leonetti, and others of RICO violations and underlying drug offenses. During this trial, on October 5, 1988, Gregorio endorsed the title to the Rolls Royce to Goodman. The transfer was never recorded on state motor vehicle records. Although it is not clear whether Gregorio delivered the title to him, Goodman did exercise some control over the car, for on March 1, 1989 he paid $4,000 to remove counter-surveillance equipment from the vehicle.

In September 1989, the FBI seized the Rolls Royce. Shortly after the seizure, Goodman came forward claiming that the car was his. The government refused to return the car, claiming that Goodman was not entitled to the Rolls Royce because it was used to facilitate drug trafficking and that Goodman knew or was at least willfully blind to that fact when he accepted the car. The car is currently impounded in Philadelphia.

## B. The District Court Opinion

Following a bench trial held on February 17, 1993, the district court held that Goodman was not entitled to keep the Rolls Royce. United States v. One 1973 Rolls Royce, V.I.N. SRH–16266, 817 F. Supp. 571 (E.D. Pa. 1993). After concluding that the government had met its burden under § 881(a)(4) to show that there was probable cause for forfeiture,[1] the court rejected Goodman's claim that he was an innocent owner. Id. at 576. According to the court, Goodman had failed to show that he was not willfully blind to the use of the Rolls Royce to facilitate drug trafficking. Id. at 576–80.[2]

---

[1]. Most of the government's case was based on the testimony of FBI Agent Randal Wolverton. He recounted statements made by Leonetti, DelGiorno, and Caramandi, who are now all cooperating witnesses and have on several occasions testified about the illegal activities of members of the Scarfo LCN crime family.

[2]. The government had also argued that it had shown probable cause that the Rolls Royce had been purchased with proceeds from illegal drug transactions, which might suffice to support forfeiture pursuant to § 881(a)(6). Because the district court decided as it did on the § 881(a)(4) question, it did not reach the § 881(a)(6) question.

The court recognized that the innocent owner defense of § 881(a)(4)(C) saves from forfeiture a vehicle used to facilitate drug trafficking if the owner can establish that the illegal activity was committed without the knowledge, consent, or willful blindness of the owner.  Relying on two cases discussing the willful blindness standard in § 881(a)(4)(C), United States v. One 1989 Jeep Wagoneer, 976 F.2d 1172, 1175 (8th Cir. 1992), and United States v. 1977 Porsche Carrera 911, 748 F. Supp. 1180, 1186 (W.D. Tex. 1990), aff'd on other grounds, 946 F.2d 30 (5th Cir. 1991), the district court formulated the following standard for willful blindness:

> Lack of willful blindness sufficient to prevail as an innocent owner under § 881(a)(4)(C) means that a claimant must show that he or she has not ignored a signal or suggestion that a vehicle might have been used to facilitate the trafficking of illegal drugs.  Such a suggestion might arise from the fact that the vehicle was owned by one accused of drug trafficking.  As in this case, once the claimant chooses to ignore the signal, he or she can no longer establish lack of willful blindness to the prior use of the vehicle that would subject it to forfeiture.

817 F. Supp. at 578.

Applying this standard, the district court found that Goodman had failed to prove that he was not willfully blind, i.e., that knowing what he did about Scarfo, he failed to show that he had taken any steps to determine whether the Rolls Royce facilitated drug trafficking.  According to the court, Goodman's representation of Leonetti in the drug trials and his cross-

examination of DelGiorno in the Beloff trial rendered his testimony that he did not think the Scarfo LCN family dealt in drugs incredible;[3] and Goodman's general knowledge of the Scarfo LCN family's involvement in drug trafficking was a sufficient "signal or suggestion" that the Rolls Royce had been used in connection with the trafficking of drugs. Id. at 580.[4] Since Goodman did nothing to determine whether the Rolls Royce in fact had been used to facilitate drug trafficking, the district court reasoned, he failed to show that he had not been willfully blind. Id.

The court went on to hold that Goodman's failure to prove that he lacked willful blindness alone defeated his innocent owner claim. Id. Goodman had claimed that notwithstanding his willful blindness, he could still prevail if he could show that he did not consent to the Rolls Royce's use in the DiSalvo and Ianarella meetings. To support this argument, Goodman pointed to 6109 Grubb Road, which had held that proof of either lack of knowledge or lack of consent was sufficient to make out an innocent owner defense under § 881(a)(7). The court

_____

[3]. Goodman had testified that as far as he knew, the LCN "abhorred" the trafficking of illegal drugs; that "if you accused [LCN] members of drugs, the hackles went up"; and that he had absolutely no indication the Rolls Royce was ever utilized to facilitate illegal drug trafficking.

[4]. The court rejected Goodman's argument that the relevant question was not whether he was willfully blind to Scarfo's or Leonetti's involvement in drugs, but whether he was willfully blind to the fact that the Rolls Royce itself was used to facilitate drug trafficking. According to the court, such an argument would "misconstrue[] the willful blindness standard." Id. at 580.

declined to extend 6109 Grubb Road to § 881(a)(4)(C), however,
reasoning that the 6109 Grubb Road approach would convert the
willful blindness language of § 881(a)(4)(C) into surplusage.[5]
The district court then entered a final judgment of forfeiture.

Goodman filed a timely appeal.  Although we may not set
aside the district court's factual findings unless they are
clearly erroneous, see Fed. R. Civ. P. 52(a), our review of the
district court's construction of § 881(a)(4)(C) is plenary.  See
United States v. 1500 Lincoln Ave., 949 F.2d 73, 76 n.3 (3d Cir.
1991).  The National Association of Criminal Defense Lawyers has
filed an amicus brief in support of Goodman's appeal.

## III. DISCUSSION

### A.  Forfeiture Under § 881(a)(4)

Section 881(a)(4) provides that "conveyances,"
including automobiles, used to facilitate drug trafficking are
subject to forfeiture.  21 U.S.C. § 881(a)(4).[6]  As with all the

_____

[5].  As the court explained:  "If a claimant were able to prevail
under § 881(a)(4)(C) . . . by showing either lack of knowledge or
lack of consent or lack of willful blindness, then the words
`willful blindness' represent nothing more than a useless third
bite at the apple."  817 F. Supp. at 581.

[6].  Section 881(a)(4) provides in pertinent part that the
following items are subject to forfeiture:

> All conveyances, including aircraft, vehicles, or
> vessels, which are used, or intended for use, to
> transport, or in any manner to facilitate the
> transportation, sale, receipt, possession, or
> concealment of [controlled substances] . . .

21 U.S.C. § 881(a)(4).

forfeiture provisions of § 881, § 881(a)(4) places upon the government the initial burden to show probable cause for forfeiture.  Probable cause exists if facts show reasonable grounds to believe that the property was used to facilitate a drug transaction.  6109 Grubb Road, 886 F.2d at 621.  Once the government shows probable cause, the burden shifts to the claimant to show that he or she has a defense to the forfeiture. The most common defense, and the only one pertinent here, is the "innocent owner" defense provided in § 881(a)(4)(C), which states that

> no conveyance shall be forfeited under [§ 881(a)(4)] to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner.

21 U.S.C. § 881(a)(4)(C).[7]  To make out the defense, the claimant must show 1) that he or she is an owner and 2) that he or she did not know, or was not willfully blind, or did not consent, to the

---

[7].  Enacted as part of the Anti-Drug Abuse Act of 1988, § 881(a)(4)(C) was in large part a reaction to the excesses of the Coast Guard's "zero tolerance" policy.  The "zero tolerance" policy had resulted in seizures of enormous commercial vessels based on the presence of minuscule personal quantities of drugs. For example, in one of the worst abuses of the forfeiture statutes, the Coast Guard seized the research vessel Atlantis because it had found one marijuana cigarette in the crew's quarters.  See Washington Digest (July 25, 1988), at 1-2, reprinted in 1 David B. Smith, Prosecution and Defense of Forfeiture Cases at ¶ 4.02[4][a] n.10, at 4-10.  This prompted Representative Gary Studds of Massachusetts to tell the acting Customs Commissioner, William von Raab, during a subcommittee hearing, "If you can't find something better to do with your limited resources than this kind of lunacy, then maybe we've been giving you too much money."  Id.

improper use of the property.  This second component of the defense can be somewhat difficult to establish because it forces the claimant to prove a negative.

There is no serious dispute that the government established probable cause that the Rolls Royce had been used to facilitate a drug transaction.  FBI Agent Randal Wolverton testified that Leonetti told him that the car was used to bring Scarfo to the meeting with DiSalvo, and that it was used to bring Ianarella, who was carrying the "street taxes," to Scarfo.  Although Agent Wolverton's testimony was merely hearsay, probable cause for forfeiture may be established by hearsay evidence, see 6109 Grubb Road, 886 F.2d at 621, and it was adequate to show probable cause here.

As we have mentioned, the main bone of contention is whether Goodman showed that he was an "innocent" owner under § 881(a)(4)(C).[8]  We first consider whether the district court

---

[8].  While the government questions whether Goodman is truly an "owner" of the car, the district court's finding that Goodman received title to the Rolls Royce on October 5, 1988 is not clearly erroneous.  Although the res is located in Pennsylvania, Goodman's interest is determined by reference to Florida law, the place where his interest arose.  See Restatement (Second) of Conflicts § 247 ("Interests in chattel are not affected by the mere removal of the chattel to another state.").  Under Florida law, the endorsement of title to him sufficed to demonstrate ownership.  See Nash Miami Motors, Inc. v. Bandel, 47 So. 2d 701 (Fla. 1950).  Although a lienholder could have an interest superior to Goodman's (because the transfer of title was unrecorded), see In re Canup Mech., Inc., 1 B.R. 703 (Bankr. M.D. Fla. 1979), the only challenge to Goodman's claim of ownership comes from the United States, which has no property interest if Goodman can sustain the innocent owner defense.  See United States v. Parcel of Land, Bldgs., Appurtenances & Improvements at 92 Buena Vista Ave., Rumson, N.J., 113 S. Ct. 1126, 1137 (1993).

(..continued)

The government has made two related arguments challenging this conclusion which we shall briefly address. First, the government submits that the appropriate law is not state law but federal common law, and as a matter of federal common law an unregistered title certificate does not create an ownership interest. Second, it contends that Goodman must be able to show that the Rolls Royce was a "true gift." The case law has generally rejected the first argument: state law defines ownership interests. See United States v. 1977 Porsche Carrera 911, 946 F.2d 30, 34 (5th Cir. 1991); United States v. Lot 9, Block 2 of Donnybrook Place, 919 F.2d 994, 1000 (5th Cir. 1990); United States v. Certain Real Property Located at 2525 LeRoy Lane, 910 F.2d 343, 347 (6th Cir. 1990) ("We see no language in the civil forfeiture provisions which would mandate the application of a federal common law of property. We conclude that recognition of state laws governing property rights does not contravene the federal forfeiture scheme, and that the application of state law is the most appropriate method of determining the interest of an owner under 21 U.S.C. § 881(a)(7)."), cert. denied, 499 U.S. 947, 111 S. Ct. 1414 (1991); see also 1500 Lincoln Ave., 949 F.2d at 75 (looking to Pennsylvania law to define owner's interest); United States v. One Single Family Residence Located at 15621 S.W. 209th Ave., Miami, Fla., 894 F.2d 1511, 1514 (11th Cir. 1990) (looking to Florida law to determine interest affected by forfeiture law). We agree with this case law.

The second argument, however, does give us pause. Although it is not entirely clear what the government means by "true gift," we believe it is contending that Goodman cannot claim innocent ownership of the property unless the transfer was bona fide in the sense that it was not by design simply a transaction to shield Scarfo's assets from forfeiture. This appears to be a variant of a proposition we have accepted in a similar context -- that nominal or straw owners lack standing to challenge a forfeiture proceeding. See United States v. Contents of Accounts Nos. 3034504504 & etc., 971 F.2d 974, 985-86 (3d Cir. 1992) (stating that in the context of the civil forfeiture provisions of title 18, 18 U.S.C. § 981, a corporation that had legal title to property but which was merely an alter ego and a straw owner, lacked standing to challenge the forfeiture), cert. denied, 113 S. Ct. 1580 (1993). Accounts No. 3034504504 interpreted standing for purposes of 18 U.S.C. § 981, but relied exclusively on cases interpreting the standing requirements under the forfeiture statute involved in this case, and is in accord with the holdings of those cases. See United States v. Premises Known as 526 Liscum Drive, 866 F.2d 213, 217 (6th Cir. 1989) (stating that "possession of bare legal title by one who does not exercise dominion or control over property may be insufficient to establish standing to challenge a forfeiture"); United States v.

properly concluded that Goodman failed to show that he was not

(..continued)
One 1945 Douglas C-54 (DC-4) Aircraft, etc., 604 F.2d 27, 28-29 (8th Cir. 1979) (holding that owners of the res have standing to challenge a forfeiture proceeding, but that bare legal title may be insufficient to establish ownership), cert. denied, 454 U.S. 1143, 102 S. Ct. 1002 (1982).

This case law is in considerable tension with the precept we have endorsed above that "ownership" is determined by reference to state law.  Although characterized as a rule of standing, the "nominal ownership" rule is in fact a back-door method of defining the ownership interest required to claim innocent owner status.  As a result, the nominal ownership rule seems to apply a federal common law gloss to the proposition that state law controls the question of ownership.  But it is not clear to us why there is any need for such a federal common law gloss since state law appears to makes adequate provision for depriving "nominal" or "straw" owners of full "ownership."  State fraudulent transaction law, alter-ego, or veil piercing doctrines, for example, allow creditors to look past legal fictions and interests to reach the property of the "true" owner.  See, e.g., West's F.S.A. § 726.105(1)(a) (under fraudulent conveyance law, "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation: (a) with actual intent to hinder, delay, or defraud any creditor of the debtor").

We believe that the standing inquiry suggests that the question of determining ownership may in fact ultimately be governed by federal common law.  Nevertheless, it is well established that federal common law may incorporate state law as the rule of decision.  See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728-30, 99 S. Ct. 1448, 1458-59 (1979); United States v. Little Lake Misere Land Co., 412 U.S. 580, 594, 93 S. Ct. 2389, 2398 (1973).  Thus, our reliance on state law to define the ownership interest may be most accurately defined as incorporation of state law as part of the federal common law. And such incorporation, for all practical purposes, is the same as total displacement of federal law by state law.  See Boyle v. United Technologies Corp., 487 U.S. 500, 507 n.3 (1988) (questioning whether there is significance to the distinction between the use of state law and the use of federal law which incorporates state law).  Since the incorporation of state law under these circumstances does not "conflict" with the federal common law rule that has developed in the standing context, we still believe it to be appropriate to apply state law.

willfully blind to the fact that the Rolls Royce was used to facilitate a drug transaction. We then consider whether Goodman should be entitled to show on remand that, notwithstanding his willful blindness (if any), he is entitled to innocent owner status because he did not consent to the drug related uses of the vehicle.

### B. Willful Blindness and § 881(a)(4)(C)

#### 1. The Standard

This court has yet to construe the "willful blindness" language in § 881(a)(4)(C). We must choose between two possible standards: an objective "due care" standard, on the one hand, and a subjective "deliberate ignorance" or "conscious avoidance" standard on the other. Under the objective standard, willful blindness exists when an owner fails to exercise due care to ensure that the property will not be and has not been used to facilitate a drug transaction. Under the subjective standard, willful blindness exists if the owner is aware of a high probability that the property will be or has been used to facilitate a drug transaction and does not make reasonable inquiries to confirm whether it will be or in fact has been so used.

Unfortunately, the statutory language does not define willful blindness, and the legislative history reveals considerable confusion over the concept. Representative Shaw, a major force behind the enactment of § 881(a)(4)(C), suggested that the willful blindness component was meant to impose a duty

on owners to be "reasonably informed concerning the purpose for which another person may use their property." 134 Cong. Rec. 33,290 (1988) (statement of Rep. Shaw). Thus he apparently endorsed the objective "due care" definition of willful blindness, a definition he derived from the Supreme Court's decision in Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S. Ct. 2080 (1974). See 134 Cong. Rec. 33, 290 (1988) (statement of Rep. Shaw).

In Calero-Toledo, the Court stated in dicta that a defense to forfeiture might be available to "an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." 416 U.S. at 689, 94 S. Ct. at 2094-95. At issue in Calero-Toledo, however, was the constitutionality of a Puerto Rican forfeiture statute, and thus the Calero-Toledo dicta only addressed a possible constitutional limit of a forfeiture statute. Ironically, then, Representative Shaw used a potential outer constitutional limit on the power of a forfeiture statute for the meaning of a provision that was intended to cut back on the reach of the statute. In other words, if the willful blindness prong in § 881(a)(4)(C) is interpreted according to the Calero-Toledo constitutional text, then the provision is entirely superfluous since the Calero-Toledo constitutional limit applies to every

forfeiture statute, even those without an innocent owner provision.[9]

Of course Calero-Toledo might still provide the meaning of willful blindness in § 881(a)(4)(C) if that is what Congress had intended. But we doubt that other legislators shared Representative Shaw's belief that the willful blindness language be equated with the Calero-Toledo dicta. Most others who made statements on the matter apparently had in mind the more traditional common law formulation of willful blindness -- a subjective "deliberate ignorance" or "conscious avoidance" state of mind. See 134 Cong. Rec. 33,288 (1988) ("Willful blindness addresses the cases of individuals who have demonstrated a conscious purpose to avoid the truth.") (statement of Rep. Young); id. at 33,313 ("[The concept of willful blindness] is intended to prevent the owner of a conveyance from closing his eyes to a violation.") (statement of Rep. Jones); id. at 33,315 ("Willful blindness addresses the case of individuals who have demonstrated a conscious purpose to avoid the truth. The concept of willful blindness is essentially part of the proof of knowledge.") (statement of Rep. Davis).

Perhaps because of the confusion in the legislative history, a circuit split appears to be developing over the

[9]. Representative Shaw's confusion over the relationship between the statutory requirement of willful blindness and Calero-Toledo is also evident from other parts of his statement about § 881(a)(4)(C). For example, he stated that "this section is not intended to overturn [Calero-Toledo]." But, since Calero-Toledo discuses the constitutional limitation on forfeiture statutes, Congress could not overturn it.

definition of willful blindness in the context of civil forfeiture. The Eleventh Circuit has held that the appropriate standard is the objective due care standard of Calero-Toledo. United States v. One 1980 Bertram 58' Motor Yacht, 876 F.2d 884, 888 (11th Cir. 1989). Bertram endorsed a pure due care standard: the owner had to do "everything that a truly innocent owner reasonably could be expected to do to insure that his vessel was not to be used illegally." Id. at 889.[10] The Eighth Circuit, however, has held in 1989 Jeep Wagoneer that the appropriate standard is the subjective one -- whether one deliberately closed his or her eyes to what otherwise would have been obvious -- and has expressly rejected the idea that the willful blindness test under § 881(a)(4)(C) should be identical to the constitutional standard of Calero-Toledo. See 976 F.2d at 1174-75.

In our leading case on willful blindness, United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985), we held that the deliberate ignorance requirement is met only if "the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." Id. at 365. Under this definition, willful blindness is a subjective state of mind that

---

[10]. In applying the willful blindness standard to the facts before it, the Bertram panel held that once an owner of a yacht advertised it for sale in Miami and a purchaser came forward with a cash deposit, the owner had a duty to ask for identification from the purchaser, call local law enforcement officials, and inquire about the purchaser's reputation in the community in order to maintain his status as an innocent owner. Id. at 888-89. Because the owner had failed to take such steps, he was held not to be an innocent owner. Id.

is deemed to satisfy a scienter requirement of knowledge.[11]

---

[11]. In Caminos, we adopted the deliberate ignorance charge that originated in United States v. Jewell, 532 F.2d 697 (9th Cir.), cert. denied, 426 U.S. 951, 96 S. Ct. 3173 (1976). In Jewell, which involved a defendant who was caught with marijuana in a compartment of his car, the Ninth Circuit endorsed the following instruction:

> The Government can complete [its] burden of proof by proving, beyond a reasonable doubt, that if the defendant was not actually aware that there was marijuana in the vehicle . . . his ignorance in that regard was solely and entirely a result of his having made a conscious purpose to disregard the nature of that which was in the vehicle . . . .

532 F.2d at 700. In dissent, Judge (now Justice) Kennedy pointed out that conscious avoidance alone is not sufficient to create a mental state equal in culpability to knowledge. According to Judge Kennedy, the conscious avoidance must be accompanied by an awareness of a high probability that a fact exists for it to be culpable. Id. at 707 (Kennedy, J., dissenting). He also argued that willful blindness cannot exist where there was an actual belief that the relevant fact did not exist. According to Judge Kennedy, lack of an instruction to that effect created a risk that a defendant would be held to an objective reasonable person standard, whereas true ignorance, no matter how unreasonable, should constitute a defense to criminal liability based on knowledge. Id.

It appears that the Caminos instruction was closer to Judge Kennedy's formulation than the majority's in Jewell. In Caminos the instruction stated in part:

> [I]f the evidence shows that [the defendant] positively did not know, then, of course, he must be acquitted. And if the evidence indicates that he was very stupid in the action he took, or ignorant, he cannot be convicted. But if the evidence shows that there was a high probability that he knew something was amiss and that he failed to take steps to investigate, to find out whether that was true or not, then you may find that he had the guilty knowledge which is required for conviction of the offense of importing a controlled substance.

770 F.2d at 366. The one incongruity between this instruction and Judge Kennedy's formulation in the Jewell dissent is that the Caminos instruction asked whether there was a high probability

Although courts and commentators have yet to come to a consensus on definition of willful blindness,[12] the Caminos formulation

(..continued)
that the defendant knew something was amiss.  Though this might have suggested some objective component to the inquiry, the Caminos panel read the instruction as requiring a subjective awareness of a high probability that something was amiss.  Id. at 365.

[12].  Willful blindness has proven to be an elusive concept and much disagreement still exists over the appropriate definition of the term.  See Jewell, 532 F.2d at 706 (Kennedy, J., dissenting) ("There is disagreement as to whether reckless disregard for the existence of a fact constitutes wilful blindness or some lesser degree of culpability. . . . There is also the question of whether to use an `objective' test based on the reasonable man, or to consider the defendant's subjective belief as dispositive." (footnotes omitted)).
        Some believe willful blindness is simply a surrogate for knowledge.  See Rollin M. Perkins, Criminal Law 776 (2d ed. 1969) ("One with a deliberate antisocial purpose in mind . . . may deliberately `shut his eyes' to avoid knowing what would otherwise be obvious to view.  In such cases, so far as the criminal law is concerned, the person acts at his peril in this regard, and is treated as having `knowledge' of the facts as they are ultimately discovered to be."); Glanville Williams, Criminal Law, The General Part § 57, at 159 (2d ed. 1961) ("To the requirement of actual knowledge there is one strictly limited exception. . . .  [T]he rule is that if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.  The rule that willful blindness is equivalent to knowledge is essential and is found throughout the criminal law."); Edwards, The Criminal Degrees of Knowledge, 17 Mod. L. Rev. 294, 298 (1954) ("For well nigh a hundred years, it has been clear from the authorities that a person who deliberately shuts his eyes to an obvious means of knowledge has sufficient mens rea for an offense based on such words as . . . `knowingly.'"). Others equate it with a less culpable state of mind.  See Robin Charlow, Wilful Ignorance, 70 Tex. L. Rev. 1351, 1429 (1992) ("Although wilful ignorance is usually employed to satisfy a statutory mens rea of knowledge, the most prevalent definitions of the doctrine describe a state of mind that is . . . not as culpable as knowledge."); Ira P. Robbins, The Ostrich Instruction:  Deliberate Ignorance as a Crim. Mens Rea, 81 Crim. L. & Criminology 191, 195 (1990) ("Deliberate ignorance constitutes recklessness, rather than knowledge.").

basically adopts the mainstream conception of willful blindness as a state of mind of much greater culpability than simple negligence or recklessness, and more akin to knowledge.  See supra n.12.  See also United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir. 1991) (willful blindness equated with the concept of "deliberate ignorance" and treated a state of mind equally culpable as actual knowledge); United States v. Rothrock, 806 F.2d 318, 323 (1st Cir. 1986) ("The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps.").  Thus in the absence of a clear statement in either the statute or the legislative history, we adopt the Caminos definition of willful blindness for § 881(a)(4)(C).[13]

---

[13].  The Caminos "deliberate ignorance" conception is careful to distance willful blindness from a due care or negligence standard.  Indeed, any willful blindness instruction must be designed to reduce the risk that willful blindness will be found where there was simply a lack of due care or even where there was recklessness.  Accord United States v. Cassiere, 4 F.3d 1006, 1023 (1st Cir. 1993) ("Caution is necessary in giving a willful blindness instruction `because of the possibility that the jury will be led to employ a negligence standard and convict a defendant [on the ground] that he should have known [an illegal act] was taking place.'" (quoting United States v. Littlefield, 840 F.2d 143, 148 n.3 (1st Cir. 1988))).

This threat has led some, including the drafters of the Model Penal Code, to conclude that the concept of willful blindness should simply be folded into the definition of knowledge.  See Model Penal Code § 2.02(7); see also Note, Model Penal Code Section 2.02(7) and Willful Blindness, 102 Yale L. J. 2231 (1993) (arguing that willful blindness should be eliminated and replaced with the broader definition of knowledge found in the Model Penal Code).  Under the Model Penal Code § 2.02(7), when knowledge of a fact is an element of an offense, it is established "if a person is aware of a high probability of its existence, unless he actually believes that it does not exist."

This construction is consistent with the general agreement manifest in the legislative history that the § 881(a)(4)(C) innocent owner defense should be the same as those of §§ 881(a)(6) and (7). Representative Shaw, for instance, stated that the defense under § 881(a)(4)(C) was "virtually identical" to the defense for innocent owners under §§ 881(a)(6) and (7). 134 Cong. Rec. 33,290 (1988). Others expressed the same sentiments. See 134 Cong. Rec. 33,288 (1988) ("The concept of willful blindness is essentially part of the proof of lack of knowledge. For this reason, the defense for innocent owners of conveyances seized for drug related offenses is virtually identical to the existing defenses for innocent owners of real property . . . or other things of value under paragraphs (6) and (7) of section 511(a) of the Controlled Substances Act (21 U.S.C. 811(a)(6) and (7)).") (statement of Rep. Young); ("[T]he defense for innocent owners of conveyances seized for drug-related offense[s] is virtually identical to the existing defenses for innocent owners of real property, and money . . . .") (statement of Rep. Young); see also 1 David Smith, Prosecution and Defense of Forfeiture Cases ¶ 4.02[4][a], at 4-10 (1993) ("[Section

(..continued)
The Model Penal Code provision "requires an awareness of a high probability that a fact exists, not merely a reckless disregard, or a suspicion followed by a failure to make further inquiry. It also establishes knowledge as a matter of subjective belief, an important safeguard against diluting the guilty state of mind required for conviction." Jewell, 532 F.2d at 707 (Kennedy, J., dissenting). This, as noted, is consistent with Cominos. The Supreme Court has explicitly endorsed the Model Penal Code formulation for knowledge. See Turner v. United States, 396 U.S. 398, 416, 90 S. Ct. 642, 652 (1970); Leary v. United States, 395 U.S. 6, 46 n.93, 89 S. Ct. 1532, 1553 n.93 (1969).

881(a)(4)(C)] should be interpreted in pari materia with the identical innocent owner provisions in sections 881(a)(6) and (a)(7).").

Our construction is further supported by the fact that, despite the textual absence of willful blindness terminology, both § 881(a)(6) and § 881(a)(7) have been interpreted by many courts to require owners to demonstrate not only a lack of actual knowledge, but also a lack of willful blindness.[14] Because the only way willful blindness can become part of the innocent owner defense in those sections is if the "knowledge" component is read to incorporate willful blindness, courts have tended to adopt the "deliberate ignorance" formulation of willful blindness in §§ 881(a)(6) and (7).  See, e.g., 1980 Red Ferrari, 827 F.2d at 480 (stating that the claimant could have avoided knowledge that the

---

[14].    See United States v. 1980 Red Ferrari, 827 F.2d 477 (9th Cir. 1987);  United States v. One Parcel of Property at 755 Forest Road, 985 F.2d 70, 72 (2d Cir. 1993); United States v. $4,255,000, 762 F.2d 895, 906 (11th Cir. 1985) (upholding § 881(a)(6) forfeiture where the owner "indicated a tacit acknowledgement of his disquieting belief that these large cash deposits were coming to [a depositor] by way of Colombian couriers carrying narcotic-generated cash" and "[the owner] had a `gnawing belief that the funds being dealt with were tainted'"), cert. denied, 474 U.S. 1056, 106 S. Ct. 795 (1986); 1977 Porsche Carrera 911, 748 F. Supp. at 1186 ("The `willful blindness' language of subsection (4)(C) is absent from subsection (6), but the legislative history behind the differing language may suggest that Congress intended that a claimant prove the absence of all three circumstances --- knowledge, consent, and willful blindness -- to prevail under any of the subsections of section 881 to which the innocent owner exception applies.").  But see United States v. One Single Family Residence Located at 6960 MiraFlores Ave., 995 F.2d 1558, 1564 (11th Cir. 1993) (finding irrelevant under § 881(a)(7) whether the owner "deliberately closed his eyes to what he had every reason to believe was the truth").

Ferrari was involved in drug trafficking only by "sticking his head in the sand" (internal quotation omitted)). Thus, interpreting § 881(a)(4)(C) to require the owner to show a lack of deliberate ignorance ensures that its innocent owner defense is the same as that required under §§ 881(a)(6) and (7).[15]

2. Application of the Standard

Turning now to the facts before us, under the standard we adopt today, willful blindness could not be found if it were positively established that Goodman did not know that the Rolls Royce was used for drug trafficking. Similarly, if Goodman were just lacking in intelligence, negligent, or mistaken, he should not be found to have been willfully blind. But if Goodman fails to show that he did not know there was a high probability that the vehicle had been used to traffic drugs, and then fails to show that he took affirmative steps to investigate whether the car had in fact been used to facilitate drug trafficking, he will not have satisfied his burden to show that he was not willfully blind.

---

[15]. This conclusion is also consistent with the view of a leading commentator. See 1 Smith at ¶ 4.03[c][ii], at 4-90.1-90.2 ("Deliberate avoidance of knowledge by sticking one's head in the sand will be equated with actual knowledge, as in criminal cases. This is so regardless of the fact that sections 881(a)(6) and (a)(7) do not contain an explicit `willful blindness' exception to the defense for innocent owners, unlike section 881(a)(4). However, failure to exercise due care does not preclude reliance on the innocent owner defense."); id. at ¶ 4.03[c][ii], at 4-90.2 n.82 (describing cases that equate willful blindness with a lack of due care as "clearly wrong" and stating that willful blindness should not be equated with negligence).

Unfortunately, we cannot determine whether the district court used the appropriate standard when it held that Goodman failed to show that he was not willfully blind. The district court formulated the willful blindness standard as "ignor[ing] a signal or suggestion that a vehicle might have been used to facilitate the trafficking of illegal drugs" and explained that "once the claimant chooses to ignore the signal, he or she can no longer establish lack to willful blindness to the prior use of the vehicle . . . ." Amicus argues that this language is an objective "due care" formulation. The government disagrees. We are inclined to agree with amicus, though we cannot tell for sure. Although the district court supported its conclusion by citing 1989 Jeep Wagoneer, 976 F.2d at 1175, which endorsed a subjective standard, it then cited language from 1977 Porsche Carrera 911, 748 F. Supp. at 1186, which seems to endorse an objective one. Moreover, the standard announced by the district court focuses on the owner rather than the car (it stated "[s]uch a suggestion might arise from the fact that the vehicle was owned by one accused of drug trafficking,"), but it does so erroneously, see infra at 35. We therefore will vacate the judgment of forfeiture and remand for reconsideration under the standard we articulate today. We take this opportunity to provide some guidance to the district court in considering this issue on remand.

It appears from the record before us that it is virtually undisputed that Goodman took no steps to investigate whether the Rolls Royce had been used to facilitate drug

trafficking at the time he acquired it.  The principal issue on remand, therefore, reduces to the following factual inquiry: whether Goodman had actual knowledge of a high probability that the Rolls Royce was used in drug trafficking.

Although the standard we announce requires proof of actual knowledge of the high probability, such knowledge is commonly proven by inference from circumstantial evidence.  Thus, for example, if it is proven that Goodman knew that Scarfo's only income was through drug trafficking, and the court finds that such facts are sufficient to support a conclusion that there was a high probability that the Rolls Royce had been used to facilitate drug trafficking, the district court could reasonably infer that Goodman actually knew about the high probability.  The court may also reject testimony to the contrary that it finds is incredible, such as Goodman's claim that he did not know about the high probability that the car facilitated a drug transaction because Scarfo and the LCN had a rule against drug dealing.

One question that has arisen on this appeal is whether the "high probability" prong of the willful blindness test requires knowledge of a high probability that the vehicle itself was used to facilitate drug transactions, or whether it refers to knowledge of a high probability that the former owner of the vehicle was accused of drug trafficking.  So stated, the answer is simple.  Because this forfeiture action focuses on the taint of the res itself, the relevant question is whether Goodman knew of the high probability that the Rolls Royce itself was used to traffic drugs.  The more difficult question, however, is whether

knowledge that the previous owner had been accused of drug trafficking is sufficient, standing alone, to support an inference that the transferee was aware of a high probability that the car itself was used to facilitate drug trafficking. We do not think so.

Standing alone, an accusation of drug trafficking, even if in the form of an indictment, does not create a sufficiently high probability that property of the accused was used to facilitate drug trafficking. In our view, it is unreasonable to conclude that a claimant's knowledge of such an accusation, without more, supports the inference that the claimant was aware of a high probability that all of the property of the accused is tainted. The accused may have sources of income from legitimate businesses, and, in the context of this case, even if Goodman believed that Scarfo had no legitimate sources of income, he may have believed that his income came from illegal activities that had little or nothing to do with drug trafficking, or that Scarfo might have owned other cars other than the Rolls Royce that he used in drug trafficking.[16] We doubt that the civil forfeiture provisions, which are aimed at combating drug trafficking, are meant to allow forfeiture of property used in or bought from non-drug related illegal activity.

---

[16]. For example, Scarfo may have received a good deal of his income from loan-sharking, extortion, or illegal gambling operations. Thus Goodman may have thought that the probability was quite low that the Rolls Royce was purchased with proceeds from the drug trafficking of which Scarfo was accused or that Scarfo had used the Rolls Royce in drug transactions.

We do not mean to suggest that Goodman has shown that he was not willfully blind. We state only that his knowledge that Scarfo had been indicted for drug dealing did not, by itself, necessarily invest Goodman with knowledge of a high probability that the car was tainted. However, there appears to be some evidence that Goodman knew more about the Rolls Royce's particular involvement in illegal activity than simply that its owner had been accused of drug trafficking. Specifically, shortly after he received ownership of the Rolls Royce, Goodman spent $4,000 removing counter-surveillance equipment from it. In any event, we leave the question to the district court on remand.[17]

---

[17]. Another vexing aspect of the problem bears mention. Goodman was not just any old acquirer of the Rolls Royce -- he was a lawyer. And although the Rolls Royce was not transferred to him as a fee for legal services, but as repayment of a debt, we can scarcely write on so important and sensitive a subject without recognizing that the car could very easily have been a fee. We therefore believe that we should at least touch upon the question whether our decision on this question creates an unwarranted strain on the attorney/client relationship.

It might be argued that the rule we fashion today, when applied in the context of an attorney's fee, creates an incentive on the part of the attorney to avoid investigating the client's case for fear that he or she might discover something that would negate an innocent owner defense and subject the fee to forfeiture. Obviously a rule that creates such an incentive potentially compromises an accused's Sixth Amendment right to have a lawyer who thoroughly investigates his or her case.

But such an argument assumes that an attorney would lose the benefit of the innocent owner defense in a forfeiture proceeding against a fee if he or she discovered the taint after receiving the fee. We do not think such an assumption to be sound. Although at least one case suggests that a fee might be subject to forfeiture even when discovery of the taint occurs after the transfer, see 1977 Porsche Carrera 911, 748 F. Supp. at 1188 (stating that even when a lawyer who is unaware of the taint at the precise moment of acquisition, it is forfeitable if he or she learns of the taint soon afterwards), 92 Buena Vista Avenue

In sum, we hold that, to avoid the "willful blindness" prong of the innocent owner defense in § 881(a)(4)(C), Goodman must demonstrate that he was not subjectively aware of a high probability that the Rolls Royce either was or was going to be used to facilitate an illegal drug transaction, or, if he was, that he took reasonable affirmative steps under the circumstances to determine whether in fact the vehicle was going to be or had been so used.  We also conclude that in applying this standard,

(..continued)
suggests the contrary.  See 113 S. Ct. at 1145 (Kennedy, J., dissenting) ("another oddity now given to us by the plurality decision is that a gratuitous transferee must forfeit the proceeds of a drug deal if she knew of the drug deal before she received the proceeds, but not if she discovered it a moment after.") (emphasis supplied).  And, as we discuss in the next subsection, fees may not be subject to forfeiture even if the attorney had known of the taint at the time the fee was received, as long as he or she did not know about the act creating the taint at the time it was committed.  If an attorney would not lose the fee when he or she only discovers the taint after receiving the property, then the rule we fashion would create no disincentive for an attorney to investigate a client's case.  It would merely create an incentive for an attorney to require payment of the fee (or retainer) up-front.
          On the other hand, if an indictment or other serious accusation is enough, by itself, to create knowledge of a high probability of the taint that would trigger a duty to investigate the source of a fee, attorneys would be reluctant to take on any clients accused of drug trafficking.  Generally speaking, should an innocent ownership claim be defeatable simply because the property was owned by one accused of drug trafficking, a lawyer would hesitate to ever accept a fee in a drug case, a money laundering case, a structuring case, see 18 U.S.C. § 981(a)(2), or a RICO case, see 18 U.S.C. § 1963(c).  There is, of course, no Sixth Amendment right to the attorney of one's choosing, see Caplin & Drysdale v. United States, 491 U.S. 617, 624-25, 109 S. Ct. 2646, 2652 (1989), but we do doubt that the statute was meant to induce such a result.  At all events, this difficult and vexatious problem needs much further consideration.

the mere fact that Goodman was aware that Scarfo had been accused of drug trafficking does not, by itself, show that Goodman was aware of a high probability that the property was tainted.  We now consider whether Goodman should also be entitled to innocent owner defense if he shows that he did not consent to the Rolls Royce's improper use.

### C.    Is Lack of Consent An Independent Defense Under § 881(a)(4)?

### 1.  Analysis

Should the district court conclude on remand that Goodman was willfully blind, the question will arise whether such a conclusion will defeat his claim of innocent owner status.  As has been mentioned, the district court believed that it did, and rejected Goodman's argument that, under 6109 Grubb Road, he should still be entitled to innocent owner protection if he could show that he did not consent to the use of the Rolls Royce to facilitate a drug transaction.  See 817 F. Supp. at 580.  As we have also noted above, 6109 Grubb Road held that, in the context of a § 881(a)(7) forfeiture, an owner who had knowledge of the taint will still be considered an innocent owner upon a showing that he or she did not consent to the use which caused the taint.  The district court refused to apply 6109 Grubb Road, stating that the case did not govern § 881(a)(4)(C) forfeitures.

In 6109 Grubb Road, the claimant admitted knowing that her property had been used for drug dealing.  She argued, however, that notwithstanding such knowledge, she should still be

entitled to innocent owner status because she could show that she did not consent to its use therefor.  Relying principally on the canon of construction that words separated by an "or" must be given independent meaning, the panel agreed, concluding that the lack of either knowledge or consent established innocent owner status.  886 F.2d at 626.

We believe that the 6109 Grubb Road analysis is applicable to § 881(a)(4)(C) for two reasons.  First, for all practical purposes, although the willful blindness language appears only in § 881(a)(4), the tests for innocent ownership under all three provisions are virtually identical, and hence the construction should be consistent.  See supra at 31.  Since the choice between reading the conditions for innocent owner status in the disjunctive or conjunctive will have a dramatic effect on the nature of the defenses, the construction should remain consistent across all three subsections in order to keep the defenses "virtually identical," see supra at 31.

Second, and more importantly, the central logic of the 6109 Grubb Road decision mandates the same result in the context of § 881(a)(4).  As has been mentioned, the 6109 Grubb Road panel ultimately based its decision on the language and structure of the statute, in particular, the use of the traditionally disjunctive word "or."  886 F.2d at 626 ("The use of or in the statute (knowledge or consent) means that each word must be given its independent and ordinary meaning. . . .  Reading `knowledge or consent' as the canons of construction require, we conclude that [the claimant] can show innocent ownership by proving by a

preponderance of the evidence that the illegal use of the property occurred either without her knowledge or without her consent."). Although § 881(a)(4)(C) adds the willful blindness notion, the language and structure of the provision is identical to that of § 881(a)(7), including the use of the traditional disjunctive "or." The government asks us to overlook the obvious similarities between §§ 881(a)(4)(C) and (7) for purposes of applying 6109 Grubb Road, contending that, to transpose 6109 Grubb Road to § 881(a)(4)(C) would lead to the absurd result that every owner could establish the innocent owner defense.

The government's argument goes as follows. First, the government recognizes that if 6109 Grubb Road is extended to § 881(a)(4)(C), an owner can prevail on the innocent owner defense by showing either a lack of willful blindness or a lack of knowledge. Second, the government assumes that willful blindness and knowledge are mutually exclusive. In other words, the government maintains that if the court finds that the owner knew that the conveyance was used to facilitate drug transactions, it must logically conclude that the owner was not willfully blind thereto; concomitantly, the government contends that if the court finds that the owner was willfully blind to the conveyance having been used to facilitate drug transactions, it must necessarily conclude that the owner lacked knowledge thereof. Accordingly, the government maintains, an owner can always show that he or she either lacked knowledge or was not willfully blind, causing the 6109 Grubb Road construction to create the absurd situation in which an owner could successfully make out the innocent owner

defense simply by failing to satisfy one of the conditions for innocent owner status. Under this analysis, it argues, 6109 Grubb Road cannot apply.

But in the world of logic, a syllogism is valid only if its premises are sound, and it appears to us that one of the government's premises is false. As our discussion of willful blindness in the previous section demonstrates, willful blindness and knowledge are not mutually exclusive states of mind. Willful blindness, as it is used in § 881(a)(4)(C), and as it has been used traditionally, is an alternative way of proving knowledge. In terms, "knowledge" comprises both actual knowledge -- a subjective belief that something is true -- and willful blindness -- a subjective belief that it is highly probably that something is true. In other words, willful blindness is a subset of knowledge. For this reason, proof of willful blindness has been sufficient to prove knowledge in the context of §§ 881(a)(6) and (7). Since such proof establishes knowledge in the context of those sections, it also be suffices to establish knowledge in the context of § 881(a)(4)(C), for we see no reason to construe the term "knowledge" in § 881(a)(4)(C) differently from §§ 881(a)(6) and (7). It follows, then, that an owner's failure to prove a lack of willful blindness simultaneously amounts to a failure to prove lack of knowledge for purposes of the statute. As a result, the illogical result the government fears if we apply 6109 Grubb Road to § 881(a)(4)(C) is illusory.

The fact that § 881(a)(7) has been interpreted to deprive a claimant of innocent owner status where the owner was

willfully blind is important for another reason.  If the government is correct that willful blindness and actual knowledge are mutually exclusive mental states, then the "illogical" result would also exist in the context of § 881(a)(7).  In other words, the government's assumption that willful blindness and knowledge are mutually exclusive is at odds with the well settled case law holding that willful blindness is sufficient to deprive a claimant of the innocent owner defense of § 881(a)(7).  In short, the government's argument is really a veiled criticism of 6109 Grubb Road, not just of its application to § 881(a)(4)(C), and does not provide a basis for distinguishing § 881(a)(7) from § 881(a)(4)(C).

        We can find no reason why the rationale of 6109 Grubb Road should not apply with equal force to forfeitures under § 881(a)(4)(C).  The legislative history clearly tells us that the defenses under § 881(a)(7) and § 881(a)(4)(C) are the same; the structure of the language in § 881(a)(4)(C) is identical to that in § 881(a)(7), so the same canons of construction that were controlling 6109 Grubb Road lead to an identical result here.  Section 881(a)(4)(C) does not embody any policy distinct from § 881(a)(7) which would otherwise prevent the application of 6109 Grubb Road to the construction of its language.  We therefore conclude that the innocent owner defense of § 881(a)(4)(C) is available to any owner who can prove any one of either a lack of knowledge, lack of consent, or lack of willful blindness.  Accordingly Goodman should be entitled to innocent owner status

if he did not consent to the use of the Rolls Royce in facilitating drug trafficking.

### 2. The 6109 Grubb Road Problem

A straightforward application of 6109 Grubb Road to the facts of this case suggests that on remand, Goodman could show that he did not consent to the improper use of the Rolls Royce by proving that he did not own the car at the time that it was used to facilitate drug transactions, that he was not in a position to prevent such a use of the car, and that he did not know that the car was being used for such a purpose at the time it was so used or, if he knew, that he took all reasonable steps to prevent such use. If Goodman did not know that the Rolls Royce was going to be used in the DiSalvo or Ianarella meetings, he simply could not have consented to such a use. As a result, even if Goodman actually knew about or was willfully blind to the car's past improper use at the time he obtained ownership of it, he could not have consented to such improper use, and hence would be an innocent owner. Because we do not see how a person can consent to a particular use of property if he or she did not know that the property would be so used at or before the time of the use, the 6109 Grubb Road approach means that a subsequent owner who did not know about the act creating the taint on the property at or before it was committed would always be an innocent owner under the statute -- even if he or she knew about the act creating the taint at the time he or she received the property.

The result we reach by applying 6109 Grubb Road raises the question whether that case was properly decided as an original matter. We, of course, cannot avoid the holding of that opinion, see Third Circuit Internal Operating Procedures 9.1, but the result 6109 Grubb Road created here seems at first blush sufficiently counterintuitive that the case needs more explaining. As we describe below, although the rationale given in 6109 Grubb Road is not free from doubt, the result is quite sensible as a matter of policy. Indeed, as we also detail below, the puzzling result cannot be laid at the feet of the 6109 Grubb Road panel. Rather, in our view, the cause is the nearly impenetrable language of the statute and an intervening Supreme Court decision, 92 Buena Vista, the importance of which the 6109 Grubb Road panel would not have anticipated.

We begin by noting that the rationale provided in 6109 Grubb Road is vulnerable.[18] The argument that the existence of the word "or" between the words knowledge and consent requires a disjunctive reading of the conditions that an owner needs to establish to show innocent owner status, arguably overlooked the importance of context in determining whether the conditions should be treated as disjunctive or conjunctive. Whether requirements in a statute are to be treated as disjunctive or conjunctive does not always turn on whether the word "or" is

_____

[18]. At the time it was decided, three judges on this court believed that the decision was incorrect. See United States v. Parcel of Real Property Known As 6109 Grubb Road, 890 F.2d 659 (3d Cir. 1989) (sur petition for rehearing) (Greenberg, J., dissenting).

used; rather it turns on context.  For example, if a statute

provides that "no cars or motorcycles are allowed in the park," a

person trying to keep a vehicle out of the park need only show

that the vehicle is either a car or a motorcycle.  From that

perspective the statute is disjunctive.  On the other hand, a

person trying to bring a vehicle into the park must show both

that it is not a car and that it is not a motorcycle.  From that

perspective, the statute is conjunctive.  Depending on the

relevant context, a disjunctive test can always be reformulated

as a conjunctive one.[19]

   To be fair to the 6109 Grubb Road panel, part of the

problem in both 6109 Grubb Road and in this case stems from the

language of the statute itself.  Filled with negatives, its

language is nearly impenetrable.  The difficulty with the 6109

Grubb Road linguistic interpretation is demonstrated by removing

two of the negatives (which should not change the meaning of the

---

[19].  A principle used in symbolic logic called DeMorgan's Theorem
illustrates how language phrased in the disjunctive can be
rephrased in the conjunctive.  Under DeMorgan's Theorem the
denial of the alternation [not A or B] is equivalent to the
conjunction of the denials [not A and not B].  See Lalit K.
Loomba, The Innocent Owner Defense to Real Property Forfeiture
Under the Comprehensive Crime Control Act of 1984, 58 Fordham L.
Rev. 473, 481 n.68 (1989); see also United States v. Certain Real
Property & Premises Known as 890 Noyac Road, 739 F. Supp. 111,
113-15 (E.D.N.Y. 1990) (specifically referring to DeMorgan's
Theorem in construing § 881(a)(7)), rev'd, 945 F.2d 1252 (2d Cir.
1991).  Section 881(a)(7) requires an owner to establish that the
drug trafficking was committed "without his knowledge or
consent."  Showing that something was without knowledge or
consent is a denial of the alternation; thus according to
DeMorgan's Theorem, the owner must show the conjunction of the
denial, that is, that there was no knowledge and no consent.

statute) and the burden of proof language (which merely indicates

who has to satisfy the requirements of the statute without

indicating what the party with the burden must show):

> [] property shall be forfeited under [§ 881(a)(7)] to
> the extent of an interest of an owner, by reason of any
> act or omission . . . committed or omitted with[] the
> knowledge or consent of the owner.

Parsed with the negatives and the burden of proof language

excised, the statute provides that an act or omission committed

under any one of the two conditions will preclude an innocent

owner defense. If an act is committed with knowledge, the

vehicle is forfeited, and if it is committed with consent, it is

forfeited. Thus, a conjunctive, rather than disjunctive, reading

seems plausible.

Of course, one might resort to the legislative history

to construe the language, but unfortunately the legislative

history is unhelpful on this issue.[20] The textual analysis does

---

[20]. The legislative histories of §§ 881(a)(4)(C), (6) and (7) do
not clearly state whether the conditions for the innocent owner
defense should be read in the disjunctive or conjunctive. Both §
881(a)(4)(C) and § 881(a)(7) have sparse legislative histories on
this point. The legislative histories from both statutes,
however, reference § 881(a)(6). Where reference in the
legislative history of §§ 881(a)(4)(C) and (7) is made to §
881(a)(6), it is appropriate to look at the legislative history
of § 881(a)(6) in construing those subsections. See 6109 Grubb
Road, 886 F.2d at 625; United States v. One Parcel of Real Estate
at 1012 Germantown Road, 963 F.2d 1496, 1505 (11th Cir. 1992).
However, although Congress suggested that the proper
interpretation of the "knew or consented" language of § 881(a)(6)
would require the owner to prove the lack of both, see Joint
Explanatory Statement of Titles II and III to the Psychotropic
Substances Act of 1978, 124 Cong. Rec. 17,647 (1978), reprinted
in 1978 U.S.C.C.A.N. 9518, 9522-23 ("[T]he property would not be
subject to forfeiture unless the owner knew or consented to the
[illegal conduct]."), some have questioned whether this statement
from the legislative history is entitled to much weight because

not, however, leave 6109 Grubb Road insupportable.  Quite to the contrary, at least three different reasons justify the 6109 Grubb Road approach.  First, the 6109 Grubb Road construction avoids making the "consent" requirement surplusage.  Construing the statute to require the claimant to negate both knowledge and consent renders the "consent" language redundant.  In other words, if a claimant established a lack of knowledge, this would necessarily negate any consent to the illegal activity, because "in order to consent to drug activity, one must know about it." United States v. 141st St. Corp., 911 F.2d 870, 878 (2d Cir. 1990), cert. denied, 498 U.S. 1109, 111 S. Ct. 1017 (1991) (quoted in 1 Smith at ¶ 4.02[6][d]).  Under a conjunctive reading, "[t]he term consent would be totally unnecessary since the factfinder would never reach the issue of consent once it concluded that the claimant either had knowledge or lacked knowledge."  1 Smith at ¶ 4.02[6][d].[21]

(..continued)
other parts of the document show confusion on how the forfeiture statute was meant to operate.  See Loomba, 58 Fordham L. Rev. at 484.

The statement apparently incorrectly intimated that the burden of proof as to knowledge and consent was on the government, something that is clearly not the case, and at least one commentator has concluded from this that the statement may have incorrectly understood other aspects of the statute as well, including whether the owner must prove both lack of knowledge and lack of consent.  See Loomba, 58 Fordham L. Rev. at 484.  It is not entirely clear to us that this statement does put the burden of proof on the government and, even if it did, why such a mistake means that we should ignore the language suggesting that the owner must prove a lack of knowledge and consent. Nevertheless, we agree that this legislative history is not very helpful.

[21].  Of course, any reading (conjunctive or disjunctive) will render one of the two terms redundant.  As one term (consent) is

Second, and more importantly, the 6109 Grubb Road construction ameliorates some of the harsh effects of the forfeiture statute.  It allows an owner to keep the property when he or she has done everything reasonably possible to prevent its use in drug activity.  See, e.g., United States v. All Right Title & Interest in Property Known as 710 Main St., 744 F. Supp. 510, 524-25 (S.D.N.Y. 1990) (holding that a landlord who closed off portions of a building used in drug trafficking, posted signs discouraging drug trafficking, restricted hours of operation of one of the businesses, and made anonymous phone calls to the police to report drug activity at his property, was an innocent owner); United States v. Certain Real Property & Premises Known as 171-02 Liberty Ave., 710 F. Supp. 46, 50-53 (E.D.N.Y. 1989) (holding on a motion for summary judgment that a landlord who had purchased property in a drug infested neighborhood with the intention of fixing it up, and who, after admitting knowledge of drug related activities in his building cooperated with police to try to clean it up, pressed criminal trespass charges against some drug dealers, and allowed police to tear down fences and steel doors that the dealers had erected to obstruct

(..continued)
a subset of the other (knowledge), the alternative disjunctive reading of 6109 Grubb Road renders the knowledge term superfluous (i.e. once the claimant successfully shows a lack of consent, a finding of knowledge would become irrelevant).  Consequently, while the redundancy argument does not mandate the 6109 Grubb Road reading, it does show the impossible textual box that the statutory language creates.

surveillance, had shown enough for a jury to find that he was an innocent owner).[22]

Third, the 6109 Grubb Road construction avoids a potential constitutional problem with the statute (this third justification is independent of but related to the second one). When a landlord cognizant of drug transactions occurring at his or her property tries to do everything he or she reasonable can to prevent use of the property in that way, and the drug dealing continues, forfeiture of the property may be unduly oppressive. See Calero-Toledo, 416 U.S. at 689-90, 94 S. Ct. at 2094-95.

Not surprisingly, 6109 Grubb Road is now on one side of a circuit split on the question whether the claimant can achieve innocent owner status by showing the lack of one of the conditions. While the Second and Eleventh Circuits have followed 6109 Grubb Road, see United States v. 141st St. Corp., 911 F.2d 870, 877-80 (2d Cir. 1990), cert. denied, 498 U.S. 1109, 111 S. Ct. 1017 (1991); United States v. One Single Family Residence Located at 15603 85th Ave. N., 933 F.2d 976, 982 (11th Cir. 1991) (stating that an owner with actual knowledge that the property was used or is being used for drug trafficking can keep the

---

[22]. The Second Circuit, however, has set quite a high threshold for owners in similar situations to show that they took reasonable steps to prevent the improper use. See United States v. Two Parcels of Property Located at 19 and 25 Castle Street, New Haven, CT., 1994 WL 378646 (2d Cir. July 18, 1994) (owners whose children were using drugs in home and who asked their children to attend a rehabilitation program, sent some of the children away, and notified police of narcotics activity in the neighborhood, did not undertake every reasonable means of preventing the improper use and were not innocent owners).

property if he can show that "everything reasonably possible was done" to prevent the taint),[23] the Ninth Circuit has adopted the opposite position, see United States v. One Parcel of Land at Lot 111-B, 902 F.2d 1443, 1445 (9th Cir. 1990) ("[I]f the claimant either knew or consented to the illegal activities, the `innocent owner' defense is unavailable."); see also 890 Noyac Road, 739 F. Supp. at 113-115 (providing a good explanation of the problem with 6109 Grubb Road); cf. 1989 Jeep Wagoneer, 976 F.2d at 1174 (8th Cir.) (noting the circuit split without not taking a position on the question).[24]

_____

[23]. See 1012 Germantown Road, 963 F.2d at 1504-05 (11th Cir.) (interpreting § 881(a)(7)'s innocent owner defense to require only that the owner prove a lack of knowledge or a lack of consent; "an owner can avoid forfeiture by proving either ignorance or non-consent"); United States v. One Parcel of Property, Located at 755 Forest Road, 985 F.2d 70 (2d Cir. 1993) ("The so-called `innocent owner' defense is an affirmative defense to be proven by the owner-claimant. It permits an owner to avoid forfeiture by establishing [by a preponderance of the evidence] either that [s]he had no knowledge of the narcotics activity, or if [s]he had knowledge, that she did not consent to it." (internal quotations omitted)); United States v. Certain Real Property & Premises Located at 418 57th Street, 922 F.2d 129, 131 (2d Cir. 1990) (reversing a grant of summary judgment because the "holding in 141st Street mandates consideration of consent as well as knowledge when adjudicating an innocent owner defense to drug forfeiture"); United States v. One 107.9 Acre Parcel of Land, 898 F.2d 396 (3d Cir. 1990) (following 6109 Grubb Road and denying a non-consent defense on the ground that it was supported by nothing other than uncorroborated and self-serving statements).

[24]. Indeed subsequent statements in Congress show disagreement within Congress over whether 6109 Grubb Road misread the statute. Compare 136 Cong. Rec. 6586, 6594 (1990) (statement of Sen. Dole) (proposing an amendment to § 881(a)(7) to remedy the "incorrectness of the [6109 Grubb Road] holding") with 139 Cong. Rec. S15,612-13 (daily ed. November 10, 1993) (statement of Sen. Jeffords) (introducing a bill, S. 1655, 103rd Cong. 1st Sess. (1993), the Civil Asset Forfeiture Reform Act, which changes the

The upshot of this extended analysis of 6109 Grubb Road is that, while reasonable people can disagree about its correctness, 6109 Grubb Road is defensible.  The 6109 Grubb Road construction of the statute sensibly works to the benefit of people who own property before the illegal act is committed.  However, as we have  discussed, 6109 Grubb Road ensures that a post-illegal-act transferee who did not know of the illegal act at the time it occurred will always be able to make out the innocent owner defense, regardless of whether he or she knew about the taint at the time of the transfer.

The 6109 Grubb Road opinion makes no mention of this problem.  But that is understandable because, at the time 6109 Grubb Road was decided, its construction would have had no effect at all on the rights of post-illegal-act transferees.  At that time it was generally assumed that because of the "relation back" provision of the forfeiture statute, 21 U.S.C. § 881(h), which vested title in the United States at the moment of the illegal act, a post-illegal-act transferee could never have better title than the United States and could never benefit from the innocent

(..continued)
language in § 881(a)(7) so that it clearly adopts the 6109 Grubb Road approach).  The Senate bill, S. 1655, is companion legislation to H.R. 2417, 103rd Cong. 2d Sess. (1993), introduced in the House by Representative Hyde.  The bills propose dramatically to weaken 21 U.S.C. § 881 and are designed specifically to reject case law requiring an owner to show a lack of both knowledge and consent.  139 Cong. Rec. at S15,613 (daily ed. November 10, 1993) (citing United States v. One Parcel of Land at Lot 111-B, 902 F.2d 1443, 1445 (9th Cir. 1990) (endorsing a conjunctive construction of the innocent owner language)).

owner defense.[25]  In 1993, however, the Supreme Court decided

United States v. Parcel of Land, Bldgs., Appurtenances &

Improvements at 92 Buena Vista Avenue, Rumson, N.J., 113 S. Ct.

1126 (1993), holding that the relation back provision does not

defeat the rights of a post-illegal-act transferee who otherwise

satisfies the requirements for the innocent owner defense under §

881(a)(6).  Thus, 92 Buena Vista Avenue has the effect of making

the "knowledge or consent" language of the statute as interpreted

by 6109 Grubb Road applicable to post-illegal-act transferees

and, in turn, creates the problem of insulating certain owners

who one reasonably might not consider to be deserving.


### 3.  Dealing With The Dilemma

One possible solution to this problem would be to

divide potentially innocent owners into two categories, pre-

---

[25].  See Eggleston v. Colorado, 873 F.2d 242, 248 (10th Cir.
1989) (holding that the innocent owner provision could not help
such subsequent owners because they were not owners; "[t]he
innocent owner exception applies only to owners whose interest
vests prior to the date of the illegal act that forms the basis
for the forfeiture"), cert. denied, 493 U.S. 1070, 110 S. Ct.
1112 (1990); In re One 1985 Nissan, 889 F.2d 1317 (4th Cir. 1989)
(holding the same and citing Eggleston and United States v. 6109
Grubb Road, 708 F. Supp. 698 (W.D. Pa. 1989) to support its
conclusion); see also S. Rep. No. 225, 98th Cong., 2d Sess., 196
(1983), reprinted in, 1984 U.S.C.C.A.N. 3182, 3379 ("In civil
forfeitures, such [subsequent] transfers are voidable, for the
property is considered `tainted' from the time of its prohibited
use or acquisition."); United States v. $41,305.00 in Currency &
Traveler's Checks, 802 F.2d 1339, 1346 (11th Cir. 1986)
(suggesting that subsequent bona fide purchasers could not be
innocent owners because of § 881(h)).

illegal-act owners and post-illegal-act transferees, and apply the 6109 Grubb Road disjunctive test to the first category but the conjunctive test to the second one.[26] That approach is, in fact, what one federal district court in Florida has followed. See United States v. One Parcel of Real Estate Located at 6640 S.W. 48th St., 831 F. Supp. 1578 (S.D. Fla. 1993). In 6640 S.W. 48th Street, the court was confronted with essentially the same problem in this case (except that it was applying § 881(a)(7)). The court recognized that 92 Buena Vista Avenue created a problem in applying the innocent owner provision to post-illegal-act transferees in jurisdictions (including its own) following the 6109 Grubb Road approach, since it realized that under such an approach, the claimant would be declared an innocent owner because "[he] could not possibly have consented to . . . the illegal activities." Id. at 1585. To avoid that result, the court declined to follow the 6109 Grubb Road approach in such a

---

[26]. Another possible approach would be to treat the term "consent" as encompassing a notion of retroactive consent. Under certain circumstances, the law treats consent as operating retroactively. The concept of ratification in agency law, for example, allows a principle to be bound by an agent's unauthorized prior act if he knows about it and fails to take affirmative steps to disavow the act. See Restatement (Second) of Agency § 83 (1958). But such a notion of retroactive consent is a stretch from what is ordinarily meant by the word consent. Indeed, perhaps because of this, even in agency law the concept of ratification requires a special relationship and does not prevent a contracting party from keeping the profits from a transaction induced by the fraud of a third person if he did not know of the fraud until after the transaction was completed. Id. at cmt. c. We therefore believe that, given the absence of any indication to the contrary from Congress, we should employ the more conventional definition of consent.

context, and concluded that the consent language should be ignored altogether when considering a post-illegal-act transferee:  "Consent is simply irrelevant when examining the innocent owner claims of post-illegal act transferees."  Id.

By performing what might be termed an act of judicial legislation, the court closed a "loophole" in the statute and prevented post-illegal-act transferees with knowledge at the time of the transfer of the property's taint from escaping the forfeiture statute.  But the statute simply draws no such distinction between pre-illegal-act owners and post-illegal-act transferees.  We cannot justify reading the very same language in a statute disjunctively with respect to one class of owners and conjunctively with respect to another, in the absence of any instruction from Congress to do so.  The dissent contends that a failure to draw such a distinction would constitute judicial abdication, citing cases which require us "to construe a statute to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose."  United States v. Schneider, 14 F.3d 876, 879-80 (3d Cir. 1994) (citing Griffin v. Oceanic Contractors, 458 U.S. 564 (1982)).  The obligation as expressed in these cases does not involve or support, however, reading statutory language differently in the absence of a justification in either the language of the statute or the legislative history.  In this case, there is no such instruction in either the statute or legislative history.

Given that the language of the statute as interpreted by 6109 Grubb Road favors Goodman in this context, we are faced

with, at the very least, an ambiguity in the statutory language. Because § 881(a)(4) is punitive and quasi-criminal in nature, see Austin v. United States, 113 S. Ct. 2801, 2810-2811 (1993) (holding that §§ 881(a)(4) and 881(a)(7) are punitive in nature), we must apply the rule of lenity, which requires us to resolve the ambiguity in favor of the claimant, see United States v. Thompson/Center Arms Co., 112 S. Ct. 2102, 2110 & n.10 (1992) (applying the rule of lenity in construing a punitive tax statute in a civil setting).[27] Thus, on remand, if Goodman can show that he did not know that the Rolls Royce was being used or going to be used in the DiSalvo or Ianarella meetings at the time they took place, then he will be able to show that he did not consent to the use and, under 6109 Grubb Road, will be entitled to the innocent owner defense.

We might be tempted to draw a similar distinction to that drawn by the court in 6640 S.W. 48th Street despite the absence of any guidance from Congress if the result we have reached here were unreasonable. But it is not unreasonable to think that post-illegal-act transferees of property interests would not be subject to forfeiture, at least with respect to §§ 881(a)(4) and (7) forfeitures. The principal goal of §§ 881(a)(4) and (7), which are aimed at forfeitures of property used to facilitate drug trafficking, is to give owners of property an incentive to prevent use of that property in the drug

---

[27]. See also id. at 2114 (Stevens, J. dissenting) ("The main function of the rule of lenity is to protect citizens from the unfair application of ambiguous punitive statutes.").

trade. People who are not owners at the time the act is committed are simply in no position to prevent the improper use. Penalizing such owners would do little to accomplish the ends of those forfeiture statutes.[28]

Moreover, at a much more fundamental level, the Court's decision in 92 Buena Vista Avenue creates substantial doubt that post-illegal-act transferees without knowledge of the illegal act until after it happened are within the scope of the forfeiture statutes. In 92 Buena Vista Avenue, the Court discussed, in dicta, the question whether such owners were within the scope of § 881(a)(6). Although the plurality suggested that equitable principles (and not the statutory language) might prevent a post-illegal-act transferee with knowledge of the illegal act at the

---

[28]. This argument is somewhat suspect if 6109 Grubb Road applies to § 881(a)(6), since § 881(a)(6)'s language providing for forfeiture of all "proceeds traceable" to drug transactions appears to include within its scope property in the hands of post-illegal-act transferees. See 124 Cong. Rec. 23,057 (1978) (remarks of Sen. Nunn) (explaining the rationale for § 881(a)(6) was "to make it clear that a bona fide party who has no knowledge or consent to the property he owns having been derived from an illegal transaction [would not have the property forfeited]"); id. at 23,056 (remarks of Sen. Culver) (describing the provision as reaching property traceable to illegal proceeds); id. at 34,667 (remarks of Sen. Culver) ("This amendment would authorize Federal officers to seize such moneys much as they now seize illicit drugs and vehicles that are used to transport or conceal these substances. In certain cases they would also be able to seize property that is traceable to such illegal transactions."); see also S. Rep. No. 98-225, 98th Cong., 2d Sess. 195-96, reprinted in 1984 U.S.C.C.A.N. 3182, 3378-79 (describing that part of the forfeiture scheme is to reach property that has been transferred by one involved in drug trafficking to avoid forfeiture). Perhaps because § 881(a)(6) appears to reach post-illegal-act transferees, we have been unable to find a court of appeals decision that squarely applied the 6109 Grubb Road analysis in the context of § 881(a)(6) forfeiture.

time of the transfer from having the benefit of the innocent owner defense, it ultimately avoided the issue by stating that "respondent has assumed the burden of convincing the trier of fact that she had no knowledge of the alleged source of [the property]."  113 S. Ct. at 1137.  In a concurring opinion, however, Justice Scalia stated that it would not be absurd to think that the forfeiture statutes did not reach post-illegal-act transferees who knew about the act creating the taint at the time of transfer, but not at the time it occurred:

> I do not find inconceivable the possibility that post-illegal-act transferees with post-illegal-act knowledge of the earlier illegality are provided a defense against forfeiture.  The Government would still be entitled to the property held by the drug dealer and by close friends and relatives who are unable to meet their burden of proof as to ignorance of the illegal act when it occurred.

92 Buena Vista Avenue, 113 S. Ct. at 1142 (Scalia, J., concurring).  If Justice Scalia is right, allowing post-illegal-act transferees with post-illegal-act knowledge to be outside the scope of the forfeiture statute is defensible, and thus a straightforward application of 6109 Grubb Road to post-illegal-act transferees would not create an absurd result.[29]

---

[29].  It is important to note that the discussion in 92 Buena Vista was focused on defining "knowledge" under the innocent owner defense, i.e., on whether "knowledge" meant pre-illegal-act knowledge.  Thus 92 Buena Vista suggests that a post-illegal-act transferee with post-illegal-act knowledge would be beyond the reach of the forfeiture statutes for reasons wholly independent of the 6109 Grubb Road construction of the statute.  We do not suggest that 92 Buena Vista directly validates the 6109 Grubb Road construction.  Rather, we refer to 92 Buena Vista in this

In his dissent in 92 Buena Vista Avenue, Justice Kennedy complained that "the plurality's opinion leaves the forfeiture scheme that is the centerpiece of the Nation's drug enforcement laws in quite a mess."  In the context of the present case, Justice Kennedy was only partially right.  It is not so much the plurality's opinion in 92 Buena Vista Avenue that leaves the civil forfeiture laws in chaos, nor for that matter is it this court's interpretation of the statute in 6109 Grubb Road. In our estimation, the problem originated in Congress when it failed to draft a statute that takes into account the substantial differences between those owners who own the property during the improper use and some of those who acquire it afterwards. Although a schizophrenic reading of the text might solve the problem, the better solution, we believe, is to apply 6109 Grubb Road.  Congress should redraft the statute, if it desires a different result.  The judgment of the district court will be vacated and the case remanded for further proceedings consistent with this opinion.

(..continued)
context to show that the result that 6109 Grubb Road invites is not unreasonable.

<u>United States v. One 1973 Rolls Royce</u>, No. 93-1417


NYGAARD, <u>Circuit Judge</u>, dissenting:


I disagree with my colleagues that we should be controlled in how we interpret § 881(a)(4)(C) by <u>United States v. 6109 Grubb Road</u>, 886 F.2d 618, 623-626 (3d Cir. 1989) and the conclusion they reach; that a purchaser of property, forfeitable in the seller's hands, need only show either a lack of knowledge or a lack of consent to raise an "innocent owner" defense under § 881(a)(7), and thereby shield the property from forfeiture.

Indeed, the majority's holding completely nullifies the "willful blindness" provision of that section, because a purchaser who is ignorant of a property's illicit use, whether willfully or innocently, can logically neither grant nor deny consent to how his predecessor used it. Moreover, one can neither deny nor give consent to the use of property unless one has either ownership or control, or for that matter, some legally cognizable interest in it. Hence, applying <u>Grubb</u> to willfully blind, post-illegal act transferees will create a virtual windfall for them, because they cannot lose. Following the majority's conclusion, one such as Goodman may purchase a mobster's car, knowing it to have been used to facilitate drug trafficking, with full confidence that it is shielded from forfeiture because he did not give the mobster his consent to use the property illicitly.

The majority reaches its conclusion because it is unable to reconcile the district court's holding with Grubb, involving § 881 (a)(7) and United States v. 92 Buena Vista., 113 S.Ct. 1126 (1993), which interpreted § 881 (a) (6) and (h). In reversing the district court, which held that Grubb does not apply to forfeitures under § 881(a)(4)(C), the majority concludes that under Grubb Goodman could invoke the innocent owner defense if he did not consent to his predecessor-in-title's use of the Rolls Royce to facilitate illegal drug transactions; this despite willfully blinding himself to that very fact.

I simply do not believe that Grubb even applies to post-illegal-act property purchasers who are aware of or willfully blind to their property's past use in facilitating illegal drug transactions. Neither Grubb nor Buena Vista applies to post-illegal-act transferees and neither interprets § 881 (a)(4)(c). The "willful blindness" language unique to §§ (a)(4)(C) requires us to interpret the innocent owner defense of that section differently from subsections that do not contain the willful blindness language; for example §§ (a)(6)&(7). I would disallow knowing or willfully blind purchasers of otherwise forfeitable property from invoking the innocent owner defense, and not expansively apply Grubb to these facts when it clearly is not warranted.

I also reject the majority's resignation that only Congress can cure this difficulty. This, I fear, is more an act

of judicial abdication than judicial restraint.  I believe we are obligated to make sense of the statute and avoid a result that contradicts its purpose.  It may be true, as my colleagues suggest, that the problem should be remedied by Congress.  I suggest, however, that we cannot hide so easily.  We are obligated to construe the statute to avoid absurd results if alternative interpretations are available, plausible and consistent with its purpose.  United States v. Schneider, 14 F.3d 876, 879-80 (3d Cir. 1994)(citing Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982)).

In sum, according to my colleagues' "straightforward" conclusion, condensed at page 8 of their Opinion (Maj. typsc. p. 8) , in Goodman's case he need only show that he did not consent to the Rolls Royce's illicit use, and is then entitled to innocent owner status.  I believe, however, their analysis contravenes both logic and Congress' very purpose in promulgating § 881, that is, to curb illegal drug activity.  I must respectfully dissent.

I.

First, however, I conclude that the district court applied the correct standard in assessing whether Goodman was willfully blind within the meaning of § 881(a)(4)(C).  The test employed by the district court was not a negligent or an objective due care standard,

nor was it inconsistent with our precedent defining willful blindness.  With no case of this court directly on point, the district court developed its own standard:

Lack of willful blindness sufficient to prevail as an innocent owner under § 881(a)(4)C) means that a claimant must show that he or she has not ignored a signal or suggestion that a vehicle might have been used to facilitate the trafficking of illegal drugs . . . . [O]nce the claimant chooses to ignore the signal, he or she can no longer establish lack of willful blindness to the prior use of the vehicle that would subject it to forfeiture.

I would conclude that the district court's standard for establishing willful blindness is consistent with United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985), in which we said that a "deliberate ignorance" jury charge "[m]ust make clear that the defendant himself was subjectively aware of the high probability of fact in question, and not merely that a reasonable man would have been aware of the probability."

Ultimately, the district court made a subjective inquiry into Goodman's state of mind when it found that he ignored rather obvious signals or suggestions that the Rolls Royce was legally infected and subject to forfeiture when he acquired it.  As the district court found, Goodman knew of Scarfo's illegal activities.  Moreover, that he had countersurveillance equipment removed from the vehicle further suggests that he was continually aware that it was legally

tainted after the transfer.  On this basis, the trial judge made a clear credibility determination against Goodman's claim, "that he had absolutely no indication [that] the Rolls Royce was ever utilized to facilitate drug trafficking", and found his testimony to be incredible.  I conclude the district court employed a subjective standard and found that Goodman was willfully blind, to which we must defer in the absence of clear error.  I would affirm both the district court standard and its subjective assessment that Goodman was willfully blind.

## II.

Second, Grubb held, in the context of § 881(a)(7), another drug forfeiture subsection, that an owner who knows a vehicle is legally contaminated will still be considered an innocent owner upon showing that he or she did not consent to its drug-trafficking use.  From similarities between § 881(a)(4)(C) and other drug forfeiture subsections, particularly §§ 881(a)(6) and (a)(7), and because we  rendered a disjunctive reading of § 881(a)(7) in 6109 Grubb Road, the majority concludes that § 881(a)(4)(C) should also be read disjunctively.

Section 881(a)(4)(C), however, contains the willful blindness language found in neither §§ 881(a)(6) nor (a)(7), civil forfeiture subsections which only provide for an innocent owner defense when there is a lack of knowledge or a lack of consent.  Moreover, the legislative history establishes that §

881(a)(4)(C)'s willful blindness language is not mere surplusage and should not be treated as such.

If we apply Grubb to forfeitures under § 881(a)(4)(C) involving willfully blind, post-illegal act transferees, we wholly disregard § 881(a)(4)(C)'s willful blindness language and Congress' intent to prevent willfully blind owners from invoking the innocent owner defense. If a claimant fails to prove lack of willful blindness, but can alternatively prevail by satisfying the sure-winner defense for a non-owner -- lack of consent -- then the willful blindness language becomes utterly nullified.

A disjunctive reading of § 881(a)(4)(C)'s "knowledge, consent or willful blindness" brings the language into direct conflict with itself, thus producing an absurd result with respect to willfully blind subsequent owners. Nevertheless, the majority applying Grubb, holds that Goodman should be allowed to prove his innocent ownership based on lack of consent. Since consent involves an owner's acquiescence to the property's use in drug trafficking, Goodman, as a subsequent owner or transferee, will always be able to show a lack of consent if he had no legal interest in or control of the Rolls Royce when it was used to facilitate the drug transaction.

As a result, any finding that Goodman was willfully blind to the vehicle's taint when he received it is useless, because if "blind," whether willfully or ignorantly, he did not

know and could not give or deny his consent, even if somehow authorized or empowered to do so.  In other words, willful blindness conceptually presupposes the absence of knowledge and consent.  When an owner fails to prove that his lack of knowledge is not the result of willful blindness, the less stringent standards for proving lack of knowledge and lack of consent are then irrelevant.

The premise of Grubb is that the language of § 881(a)(7), (no property shall be forfeited "by any reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner") should be read disjunctively because of Congress' use of the traditionally disjunctive word "or."  According to Grubb's analysis of § 881(a)(7), Congress' use of the word "or" implies that each provision to which it refers should be given independent weight.  Yet, by a disjunctive reading of § 881(a)(4)(C), a subsequent owner who avoids investigating an obvious possibility that his or her property is forfeitable in the hands of the transferor, will always be able to establish innocent owner status because of his or her lack of consent.  In sum, a disjunctive interpretation of § 881(a)(4)(C) is tantamount to ignoring the willful blindness language of that subsection.  I do not read it that way.

The district court also remedied this problem by refusing to apply Grubb to cases involving willfully blind, post-

illegal act transferees. The district court differentiates between owners who use their property to facilitate drug trafficking, where application of Grubb would make sense; and willfully blind post-illegal-act transferees, where its application would not. I would too. The import of this differentiation is that we should not blindly read the "or" in § 881(a)(4)(C) disjunctively, but rather, should examine the context in which "or" is used, because in some circumstances "or" does not apply or should be read as "and". Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)(terms connected by a disjunctive word must be given their separate meanings unless the context dictates otherwise); see also United States v. Smeathers, 884 F.2d 363-64, (8th Cir. 1989)(citing United States v. Moore, 613 F.2d 1029, 1040 (D.C.Cir. 1979))(the word "or" connotes disjunction except when a disjunctive reading would frustrate legislative intent).

Finally, Buena Vista does not create doubt that post-illegal act transferees, aware of a property's taint at the time of its conveyance or thereafter, should benefit from the forfeiture statutes' innocent owner defenses. Section 881 codifies the common law relation back doctrine, as defined by the Supreme Court in United States v. Stowell, 10 S.Ct. 244, 247 (1889), which prevents the possibility of a post-illegal act transferee invoking the innocent owner defense, because title to

a defendant's property vests in the government at the time the drug crime occurs.

In Buena Vista, the Supreme Court purposely did not address whether post-illegal act transferees could invoke the innocent owner defense because in that case the "respondent . . . assumed the burde
n of convincing the trier of fact that she had no knowledge of the alleged source of [the property]." Buena Vista, 113 S.Ct. at 1137. Hence, consideration of whether post-illegal act transferees, aware of a property's taint only at the time of conveyance or thereafter, was not central to the Court's analysis. The Court did, however, address the issue in dictum, but then leaned away from the majority position here. It stated that equitable doctrines may foreclose the assertion of the innocent owner defense by a post-illegal act transferee "with guilty knowledge of the tainted character of a property." Id.

In sum, given the legislative history of § 881 (a)(4)(C)'s willful blindness language and Buena Vista's instructional dictum about foreclosing the innocent owner defense for willfully blind subsequent owners and transferees, the district court did not err by concluding that Grubb does not apply to purchasers of forfeitable property. Section 881(a)(4)(C)'s "knowledge, consent or willful blindness" language requires a conjunctive reading to prevent conflict among the provisions, because consent to the vehicle's use in drug activity

is irrelevant if one is a willfully blind post-illegal act transferee.  Then too, given the district court's finding of willful blindness alone, Goodman was precluded from making an innocent owner defense under that subsection's other provisions. I conclude that the subject vehicle was properly forfeited and so, dissent.